Statement of the Case.
MONROE, C. J.
In April, 1912, plaintiff, being a creditor of defendant in a large amount for money loaned, and being also the holder and owner of 45 bonds of $500-each, issued by defendant and secured by mortgage on that portion of its property known as the “bottling plant,” filed a petition in the civil district court for the parish of Orleans, alleging that defendant was insolvent, and praying that it be ordered to-show cause why a receiver should not be appointed, “with full power to hold, administer, manage, and dispose of its property in such manner as the court should direct,” to-which defendant filed an answer alleging that its board of directors had passed a resolution admitting that it was unable' to-meet its obligations as they matured, and. *1049 that a receivership was necessary, and thereupon the court made an order reading in part as follows:
“It is ordered * * * that there be judgment appointing Walter Danziger and John Legier, Jr., coreceivers of the Security Brewery Company, with full authority to take charge of its assets and administer its affairs as a going concern, and that letters as such issue to them,” etc.
The persons named, having received their letters, proceeded to conduct the affairs of the defendant as those of a going concern, and in so doing contracted debts for necessary supplies and materials to a considerable amount; but the business proved unprofitable and on January 13, 1913, they presented a petition to the court alleging that it would be to the best interest of all concerned that the brewery be sold, and praying for an order to that effect, and the application was placed upon the receiver’s order book, where it remained for two months, at the end of which period, no opposition having been filed, the court, on March 13, 1913, gave judgment reading in part as follows:
“On the application of the receivers for a sale of the assets of the Security Brewery Company, the court considering that the application has been on file and placed on the recorder’s order book for more than ten days, and that no opposition has been filed thereto, and the court considering that the property covered by the first mortgage is now under seizure and in the hands of the sheriff, * * * and * * * considering the law and the evidence to justify the decree, * * * it is ordered * * that * * * coreceivers * * are * * * directed to sell all of the assets of the * * * company, except the outstanding accounts, credits, and bills receivable and the property embraced within the terms and provisions of the first mortgage, * * * at public auction,” etc.
And the decree contained some further provisions in regard to the sale of movables, of fixtures in the possession of customers, and the collection of bills receivable and open accounts.
The mortgage thus referred to rested upon the main plant and secured a balance of $120,000, remaining due out of an original debt of $200,000 contracted 'December 1,1904. There was, however, another mortgage, executed September 1, 1909, resting on the “bottling plant,” and securing a loan of $50,000, represented by bonds of $500 each, and, as the bottling plant was not excepted in the order of sale, it was sold thereunder, and on August 18, 1913, the receivers, alleging the sale, ruled the recorder of mortgages and the Interstate Bank & Trust Company, as trustee, to show cause why the mortgage should not be canceled and the holders of the bonds referred to the proceeds.
The Interstate Bank made answer to the effect that it was constituted trustee by the act of mortgage referred to in the rule, but that it was not the holder or owner of the bonds, and was not authorized to represent the holders. The recorder of mortgages excepted, on the ground that the proper parties were not before the court, and, with-reservation, denied generally the allegations of the rule; after which there was a trial, and the rule was made absolute. The receivers then (on September 18th) filed their “final account,” showing that there had come into their hands $46,333.75, of which $2,397.98 had been disbursed, leaving a balance of $44,-035.97 for distribution, of which they proposed td distribute i $22,246.75 in payment of receivers’, attorney’s, appraisers’, notary’s and accountant’s, clerk’s, and sheriff’s fees, and the remaining $21,798.22 in payment of debts of the receivership contracted for supplies and material required for the operation of the brewery.
A number of oppositions were filed, and there was a hearing and a judgment whereby the account was, in the main, approved. The opponents who are prosecuting this appeal from that judgment are three holders and owners of bonds of the series of $50,000 which were secured by mortgage on the bottling plant (the proceeds of which, amounting to $7,700, are included in the balance *1051 winch it is proposed to distribute among the furnishers of supplies and materials) to wit, the Teutonia Bank & Trust Company (plaintiff herein), the American Trust Company, and Prank W. Feuerbacker, as holders and owners, respectively, of 45, 40, and 1 of said bonds. The receivers and some of the creditors filed pleas of estoppel as against the demands of the opponents, on the ground that, by their silence and inaction, they had acquiesced in the operation of the brewery as a going concern, and cannot now be heard to dispute the privileges asserted as securing the debts incurred in that behalf, and there was judgment maintaining those pleas, from which, as before stated, the opponents are prosecuting this appeal. In the meanwhile, just before the expiration of the year, J. J. Russell, Wm. Russell, and John I-I. Vette, alleging themselves to be aggrieved by the judgment of September 4, 1913, ordering the cancellation of the mortgage on the bottling plant, had appealed from that judgment, and, by order of this court, the -two appeals have been consolidated for the purposes of their hearing and disposition.
Opinion.
[1, 2] Counsel for the three appellants first above mentioned say in their brief:
“Our position is:
“First. That the creditors granted a preference on the final account are mere ordinary creditors, and, as such, are not entitled to preference.
“Second. That our first mortgage bonds are entitled to rank as privileged and to be paid pro rata out of the proceeds from the sale of the bottling plant over all other creditors, deducting therefrom only the necessary expenses incurred in selling the property, sheriff’s fees, insurance, and taxes.”
But the tangible property was no more essential to the business than the good will, and, if the taxes and premiums of insurance paid out for the preservation of the one constitute a charge which takes precedence of the mortgage debt, it is not easy to understand why debts incurred for the preservation of the other should not be accorded the same precedence. It is not denied, and is undeniable, that the holders of the mortgage on the bottling plant, instead of applying for a receivership (as was done by the Teutonia Bank, in liquidation), might have foreclosed their mortgage by seizure and sale of the mortgaged property, and thus have relieved the property of the general expenses incidental to the receivership (as was done by the holders of the mortgage on the main plant); and they might have pursued that course even after the receivers were appointed. But the bank applied for the receivership, and the other bondholders, remained silent, and awaited the result of the experiment which was to be made, for their benefit as well as for the benefit of the brewery company, though they and the company well knew that, in order to administer the property and conduct a going business, the receivers would be obliged, not only to pay the taxes on the property and keep it insured, but to deliver beer to their customers promptly and at regular intervals, and, in order to do so, would be obliged to brew the beer, and to that end to buy malt and hops and sugar and fuel, and maintain the brewery, with lights and telephones, and the wagons, with repairs and drivers, and the horses, with feed, harness, and shoes, and that, if they did not have the cash on hand at all times for their necessities, they must borrow it or incur debt.
It was said by this court in Irion v. Knapp, 132 La. 60, 60 South. 719, 43 L. R. A. (N. S.) 940, that:
“It is essential, to maintain the plea of estoppel, that the one pleading it should have been put in a worse position by the act of the one against whom it is pleaded.”
And in People’s Bank & Trust Co. v. Sanitarium, 135 La. 947, 66 South. 307, it was held (quoting from the syllabus):
“Where a corporation owning an establishment, such as a sanitarium, in which persons are *1053 employed in various capacities, places a ‘general manag'er’ in charge, with apparently plenary power, and the principal creditor, holding a mortgage and a controlling interest in the stock, and intending to foreclose, acquiesces until the sale under foreclosure in allowing the manager to remain in charge in order that the place may be kept open and ‘going’ and command a better price, botíi the owner and the creditor will be held by contracts of employment between the manager and the employés into which the latter have entered in good faith to the extent that they will be accorded the privileges which the law allows in such cases for the balances of salaries and wages due them.”
' It is said that in this case there is no proof that the bondholders sought to be es-topped or their trustee “were ever made parties to the receivership record, or ever consented to, or acquiesced in any way in, the operation of the brewery as a “going concern.” The answer is that the Teutonia Bank filed the petition upon which the order was made appointing the receivers and directing them to take charge of the brewery, including the bottling plant, and conduct its business as that of a going concern; that the Interstate Bank and Trust Company, domiciled and actually engaged in business in New Orleans, was constituted, by the terms of the mortgage agreeably to which the bonds were issued and secured, the “agent arid mandatory of the bondholders solely and irrevocably”; that the mortgage further provided that the mortgagor should continue the operation of the mortgaged property as a going concern until final payment of the bonds and interest, and should deposit with the trustee 25 cents for each barrel of beer sold.
It is clear, therefore, that the Teutonia Bank not only knew what was done and being done, but that it provoked the action; and this court can hardly be expected to believe that the Interstate Bank was not equally well informed.
In Knickerbocker v. McKindley Coal & Mining Co., 172 Ill. 535, 50 N. E. 300, 64 Am. St. Rep. 54, it was said by the Supreme Court of Illinois in regard to the operation of a hotel:
“The appellants are estopped from saying that appellees should not be paid for the coal and groceries furnished by them to the receiver, when the receiver was running the hotel with their consent [and acquiescence] and with their furniture and fixtures. It is impossible to conceive how a hotel can be operated properly without coal and without groceries.”
And so it may be said here. It is impossible to conceive how a brewery can be operated without malt, hops, coal, wagons, horses, lights, etc., and it would be absurd to suppose that those necessities would be furnished by persons dealing in them to receivers placed in charge of a going brewery for the benefit of the creditors as well as its owners, if those interested parties were at liberty at any time to appropriate the property of the concern to the payment of their debts, and leave the debts so created through their agency and for their advantage unpaid.
It is said that the operation of the brewery did not inure to the advantage of the bondholders, but was altogether disastrous, which is quite true. But the experiment was theirs, nevertheless, and, as the profit would have been theirs, if it had proved successful, they, and not the persons who furnished, on credit, the means with which it was carried on, should bear the loss.
Apart from the question of estoppel, we are of opinion that the authority vested in, and the duty imposed on, the receivers, to operate the brewery as a going concern, carried with it the authority to incur such expenses as were necessary to the performance of that duty,' and that the expenses so incurred fall within the category and enjoy the privileges established in favor of law charges. The receivers were appointed under the authority of Act 212 of 1&10 (amending and re-enacting section 5 of Act 159 of 1898) which reads:
“Sec. 5. * * * In the order appointing such receivers, the court may, in its discretion, confer on the receivers such powers of adminis *1055 tration as it may deem best for the interests of all parties and may from time to time restrict and enlarge such powers, and may authorize any receiver of any corporation, in order to carry on the business of the corporation, to borrow or obtain money on certificates of indebtedness to be taxed as costs of court. The sum so obtained shall bear a first privilege on all * * * property real or personal, and the income of the corporation.”
The order appointing the receiver of the Security Brewing Company vested them “with, full authority to take charge of its •assets and administer its affairs as a going •concern,” and, by necessary implication, imposed upon them the duty of carrying on the business of the brewery in the ordinary way and to the best advantage; that is to say, by buying their supplies in the best market •and on the best terms, and selling their product under similar conditions. It is contended that, though they were authorized to borrow money in order to carry on the business, and issue certificates therefor, which were to be taxed as costs, they were not authorized to buy necessary supplies on credit, •or, if they did, that the unpaid price cannot be so taxed, but should be ranked with ■or below the debts due by the corporation before the appointment of the receivers. In ■other words, we are asked to construe the law to mean that, where a corporation and its creditors try the experiment of a receivership the advantages of which will inure to them in the event of its proving successful, the third persons who sell on credit to the receivers the things which are necessary to make the experiment successful, and who expect no other profit than that which they might make by selling to any one else, thereby become the insurers of the experiment, and are to bear the loss in the event it proves unsuccessful. But, if that were the proper construction, there would be no debts for current supplies or expenses of any kind, ^.nd even house rent, the salaries of clerks, and the wages of servants would have to be XJaid in advance, for no one will sell on credit under such conditions, and the business could not be conducted in the ordinary way and to the best advantage.
We take it, however, that the law which confers privileges for rent and for salaries and wages is to be construed with the act of 1910 now under consideration, and the law and jurisprudence which have determined that the expenses necessarily incurred by an officer of court in administering property under the authority and direction of the court are law charges, entitled to the privilege accorded to obligations so designated by articles 3191 and 3197 of the Civil Code, are likewise to be so construed. The Code of Practice (article 283) imposes upon the sheriff the duty of administering property held under a writ of sequestration “as a prudent father of a family, similarly situated, might do.” Jennings-Heywood Oil Synd. v. Houssiere-Latreille Oil Co., 127 La. 997, 54 South. 318, Ann. Cas. 1913E, 679; Bank v. Childs, 49 La. Ann. 1359, 1364, 22 South. 384. Article 661 of the Code of Practice authorizes the sheriff to make such disbursements as may be necessary for the preservation of property seized under execution, and, where it consists of lands, “even for their cultivation and clearing”; and in State ex rel. Vial v. Judge, 36 La. Ann. 912, the article was applied to a case of seizure under executory process, and the court used the following language:
“In commenting upon this article, this court once said, and it has since been guided accordingly: ‘There are expenses which the sheriff must necessarily pay himself, or become responsible for, in the exercise of his official duties, and which he has the right to charge for among his costs. * * * Such are the necessary disbursements for the preservation and keeping of the property under seizure.’ Haile v. Rils, 9 Rob. 509; also [Parkinson v. Boyle] 7 Rob. 83; [Avart v. King] 14 La. 62; [Decoux v. Bank of Louisiana] 2 La. Ann. 157; [Parrar v. Bowley] 3 La. Ann. 276; [Witkouski v. Witkouski] 16 La. Ann. 233.”
In State ex rel. Dauphin v. Ellis, Judge, 108 La. 531, 32 South. 340, it was said:
*1057 “An order for the appointment of a receiver is more comprehensive in its effects than either an attachment, a sequestration, or an injunction, or, in fact, than all of those writs combined, and is said to reverse the ordinary course of procedure in the administration of justice by levying a species of execution and determining after-wards who is entitled to the benefits.”
[3] The argument that the provision in Act 212 of 1910 authorizing a receiver to borrow money and issue certificates therefor, to be taxed as costs, excludes the idea that he may incur debts for necessary supplies, does not appear to us to be well founded. The lawmaker, we think, proceeded upon the theory that a receiver to whom authority is granted to conduct as that of a going concern the business of a corporation of which he is placed in charge would have the right to incur debt for the material and supplies necessary to the business as an incident to that authority, but that, in the event of his being obliged to borrow money, something more specific in the way of a grant might be required, either for the borrowing or the issuance of the certificates evidencing the transaction, or, as is quite likely, it may have been considered that, whilst authority to buy supplies on credit might be safely conferred, authority to borrow money had best be exercised under the eye of the court in each instance. Whilst, therefore, the right of one who should lend money to a receiver without obtaining the certificate required by the statute to recover from the receivership may well be doubted, that fact does not bear upon the right of the seller of necessary supplies so to recover, since, as we have stated, the exercise of the right by the receiver to buy such supplies is incidental to the discharge of the duty imposed upon him.
Thus, in Cake v. Mohun, 164 U. S. 311, 17 Sup. Ct. 100, 41 L. Ed. 447, being a case where the expenditures of a receiver in operating a hotel were given precedence over a debt secured by mortgage, the Supreme Court of the United States said:
“While, as a general rule, a receiver has no authority, as such, to continue and carry on the business of which he is * * * receiver, there is a discretion on the part of the court to permit this to be done when the interests of the parties seem to require it; and in such cases his power to incur obligations for supplies and materials incidental to the business follows as a necessary incident to the office” — citing Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672; Thompson v. Insurance Co., 136 U. S. 287, 10 Sup. Ct. 1019, 34 L. Ed. 408.
In Ellis v. Vernon Ice, Light & Water Co., 86 Tex. 109, 23 S. W. 858, the Supreme Court of Texas said:
“The conduct.of a business that has proved insolvent is not likely to yield a net income, and, if the. creditor of the receiver could only look to such income for the satisfaction of their claims, he would be unable to obtain credit, and the operation of the works would be impracticable. Accordingly the rule is that the expense of administering and preserving the property is to be charged, first, upon the net income, and, if that be not sufficient, then upon the property itself or its proceeds upon sale.”
In First National Bank v. Ewing, 103 Fed. 168, 43 C. C. A. 150, the United States Circuit Court of Appeals, Fifth Circuit, held that receiver’s certificates and operating expenses for which no certificates had been issued were equally entitled to precedence over the claims of the holder of first and second mortgages on a railroad, and that, though the bank, holder of the mortgage bonds, was not a party to the proceeding in which the receiver was appointed, its president was aware of the receivership and of the application for authority to issue certificates, and was bound by that action. Counsel for J. J. and Wm. Russell and John H. Vette argue that, as Vette, holder of ten of the bottling plant bonds, was not made a party to the record, his rights as a mortgage creditor are unaffected, and the opinion in Kneeland v. American Loan Co., 136 U. S. 97, 10 Sup. Ct. 950, 34 L. Ed. 383, is quoted in support of that view. In that case, however, the receiver was appointed at the instance of a judgment creditor whose rights were primed by those of the mortgage credi *1059 tors and under the supposed authority of a court of equity; whereas in this case the receiver was appointed at the instance of a mortgage creditor, contradictorily with the corporation, under authority plainly conferred by statute, and the mortgage was canceled under a judgment obtained contradictorily with the bank named in the act of mortgage under which the bonds were issued as “the agent and mandatory of the bondholders irrevocably.”
We therefore conclude that the judgment appealed from should be affirmed; and it is so ordered.