(90 South. 741)

No. 23287.

INTERNATIONAL HARVESTER CO. OF AMERICA v. UNION IRR. CO.

(April 5, 1920. On Rehearing, Jan. 30, 1922.)

(Syllabus by Editorial Staff.)

1. Stipulations ⊕⇒18(9)—Parties held barred from complaining of receivers' charges by consenting to execution of judgment.

Assuming that opponents to a provisional account of a receiver were not precluded by judgment from further investigation as to advertising bills, attorney's fees, etc., on opposition to a second provisional account, they barred whatever right they may have had by expressly consenting in a stipulation to the execution of the judgment in that respect.

2. Appeal and error ⊕⇒955—No interference with allowance of fees of attorneys, receivers, and accountant unless manifestly wrong.

On appeal in a receivership proceeding, the Supreme Court will not interfere with the judgment of the lower court as to the matter of fees of the attorney, receivers, and accountant, unless manifestly wrong.

3. Receivers ⊕⇒200—Holders of liens on property not liable for receivership expenses where they objected to receivership.

Holders of vendor's liens who never consented to the appointment of receivers, or of their administration, but, in the face of strong efforts on the part of the receivers and the court, persisted in foreclosing on their liens, were not liable for any part of the expense of the receivership, and this was not changed by an order of the court directing that, in consideration of their agreeing to postpone foreclosure until a crop could be made and harvested, they should be relieved from contributing to the costs of the receivership.

4. Receivers ⊕⇒202—Charging costs against balance after returning property subject to lien held valid in absence of objection.

It cannot be contended that a balance in hands of receiver was improperly charged with costs of receivership by action of the court, at the instance of the receivers, on returning the property to holders of vendors and other liens thereon, where application was regularly made and handled in strict accord with the statutes without objection by any one.

On Rehearing.

5. Receivers ⊕⇒158(3) — Laborers' claims held not superior to costs of receivership.

A claim for personal services rendered in the growing of a crop prior to receivership could not outrank the costs of the receivership, nor be a privilege superior to vendor's privilege upon movables, in view of Act No. 159 of 1898, § 5, as amended and re-enacted by Act No. 212 of 1910, as amended and re-enacted by Act No. 199 of 1914.

6. Receivers ⊕⇒128—Statute subordinating receivers' certificates to certain other liens held not to affect credits already given.

A loan having been finally made to receivers, and credit actually given before the passage of Act No. 199 of 1914, the contract between the receivers and the lender became definitive, and receivers' certificates held by the lender represented a debt which did not fall under such act, but enjoyed a privilege which primed that of vendors, whether of immovables or movable property, though the money was not actually given to the receivers until after such act went into effect.

**7. Receivers &#9740;200—Vendor allowing his property to remain in hands of receiver subjects the property to costs of receiver.**

A vendor of movables is entitled to have the property upon which his privilege rests seized and sold forthwith, and the proceeds distributed immediately by the receiver in a provisional account filed by the receiver, in which the proceeds of the sale only will be distributed, but a vendor which permitted its property to remain under the dominion, control, and operation of the receivership, taking the risk of an experiment, thereby subjected its property to the costs and charges of the receivership.

**8. Receivers &#9740;200—Judgment held not to relieve vendor of movables from payment of costs.**

A judgment in a receivership proceeding that plaintiff's vendor's lien and privilege on the articles described be recognized, and that he be paid from the proceeds of the sales of said articles by the receivers, in preference over all other claims or in reference thereto, saving the rights of any third parties to assert such claims as they may present to the court prior to the payment by the receivers in such proceeds, did not confer any advantage to the vendor over other creditors as to the payment of the costs of the receivership, such vendor having permitted his property to remain under the control of the receivership, and taking the risk of growing another crop.

Dawkins, J., dissenting.

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

Action by the International Harvester Company of America against the Union Irrigation Company, in which receivers were appointed. From a judgment striking items from receivers' provisional account, the receivers, plaintiff, and others appeal. Judgment amended and affirmed.

Merrick, Gensler & Schwarz, Miller, Miller & Fletchinger, and Henriques & Duchamp, all of New Orleans, and Smith & Carmouche, of Crowley, for appellant International Harvester Co. of America and others.

John W. Lewis, of Opelousas, Milling, Godchaux, Saal & Milling, of New Orleans, and R. Lee Garland, of Opelousas, for receivers of Union Irr. Co.

L. L. Perrault, of Opelousas, for appellee Planters' Nat. Bank, on rehearing.

DAWKINS, J. In its inception this was, in effect, a consent proceeding placing the Union Irrigation Company in the hands of a receiver. The plaintiff's petition contained the usual allegations of default by the corporation on its obligations, which were admitted by the defendant, and the lower court thereupon appointed Messrs. William Edenborn, of New Orleans, and J. Franklin Schell, of Washington, La., coreceivers, with authority to continue the business of the company as a going concern. About 10 days after his appointment Schell resigned, and Henry P. Dart, Sr., of New Orleans, was, at the instance of certain bondholders, appointed in his stead.

The Union Irrigation Company (hereafter referred to as the Irrigation Company) owned a large irrigation plant, costing many thousands of dollars, together with several thousand acres of rice lands, in St. Landry and Evangeline parishes, including some 35 miles of canals and laterals, and, at the date of appointing the receivers, more than 2,000 acres had been prepared for planting. Seed rice of the value of several thousand dollars had arrived on a bill of lading, with sight draft attached, and this, with other circumstances, was such that the lower court deemed it advisable to authorize the issuance of receiver's certificates to finance the planting and harvesting of a rice crop. This was accordingly done in the order making the appointment and the issue was fixed at $50,000.

Much difficulty was experienced in negotiating the certificates, but a temporary arrangement was made with the Planters' National Bank of Opelousas, La., whereby it loaned to the receivers the sum of $5,000, on

certificate No. 1, for a period of 30 days. These funds were used to release the seed rice and to pursue the planting operations. The receivers then made numerous efforts with the banks at Opelousas and in the city of New Orleans to get them to handle the remainder of the certificates but failed. Finally Edenborn induced his sister, Mrs. Lina Mann, a lady of some means, to lend the receivers some money, which was done only after Edenborn and Dart had added their individual guaranties to such amounts of the certificates as might be taken by Mrs. Mann.

The first inventory taken by the receivers showed the Irrigation Company in possession of assets slightly exceeding $903,000. As before indicated, there were included in the list an enormous pumping plant, about seven thousand acres of rice lands, canals and rights of way, and a vast amount of dredging and farming machinery, tools, vehicles and stock, necessary to make a complete and efficient plant and rice farm. Everything indicated the possibility of its being operated successfully by the receivers in the interest of the creditors and stockholders. However, further investigation, after the crop had been launched, and certificate No. 1 for $5,000 had been negotiated, revealed that, in addition to several thousand dollars of outstanding bonds, there was scarcely a piece of real or personal property which was not incumbered with vendors' liens, including the rights of way of the 35 miles of canals. Thereupon the receivers applied to the court and obtained an order restricting and limiting the lien and privilege for the payment of the certificates to the crop and personal property, on condition that the holders of vendors' liens and mortgages against lands and rights of way should agree to postpone or forego execution upon their claims until the crop could be made and harvested. This order was signed June 5, 1914, and made part of the six certificates, numbered from 2 to 7, inclusive, and which were subsequently negotiated. For some reason the receivers were never able to obtain the consent of the mortgage holders to this arrangement, and about midsummer a perfect deluge of foreclosure proceedings was precipitated upon the real property. Fruitless efforts were made by the receivers to ward off these suits until the crop could be gathered, and eventually, the greater part of the farm lands, with the growing crop, were wrested from their hands, so that, from the portion of the crop which was left, there was realized only $3,679.48.

Pursuant to the arrangement heretofore mentioned, Mrs. Mann, through her said brother, Edenborn, paid into the receivership funds as follows:

| | |
|---|---|
| June 11, 1914................................. | $16,000 00 |
| Sept. 11, 1914................................. | 3,000 00 |
| Oct. 23, 1914................................. | 1,000 00 |
| Total ................................. | $20,000 00 |

As security for the money so advanced she holds certificates Nos. 1 to 6, inclusive, all due January 1, 1915 (except No. 1, in favor of the Planters' National Bank of Opelousas, which matured May 1st, 1914, and was taken up out of funds advanced by Mrs. Mann), bearing 8 per cent. interest, and stipulating 5 per cent. attorney's fees, which certificates are for amounts as follows, to wit:

| | |
|---|---|
| No. 1 ............................................. | $5,000 00 |
| No. 2 ............................................. | 2,000 00 |
| No. 3 ............................................. | 2,000 00 |
| No. 4 ............................................. | 2,000 00 |
| No. 5 ............................................. | 5,000 00 |
| No. 6 ............................................. | 5,000 00 |

There was also issued on September 26, 1914, certificate No. 7 for $600, payable to bearer (as were all of the others except No. 1), likewise due January 1, 1915, which was delivered to John W. Lewis, as a payment on his fees as attorney for the receivers. This certificate was negotiated by Lewis and subsequently taken up out of fees allowed on the first provisional account.

As above indicated the farming operations proved very disastrous, mainly because of the involved condition of the Irrigation Company's affairs, resulting in foreclosure proceedings upon most of its real property, and, on September 22, 1914, the receivers applied to the court for authority to sell all of its property, both movable and immovable, which remained. After proper entry on the order book, no opposition appearing, the authority sought was granted October 10th. On October 29th amended application was filed, in which it was asked that the company be declared insolvent and the property ordered sold, which was done in a decree consuming some 70 pages in the transcript. The property was described in detail, as well as the liens and incumbrances resting thereon, and each piece was ordered sold separate and apart for the protection of the creditors asserting claims thereon.

In the meantime, on October 8, 1914, the court below, at the suit of the receivers, and apparently without opposition on the part of the defendant therein, annulled sales of real property made to the corporation by J. Franklin Schell, and canceled its note held by him for $204,403.33, as well as the assumption of a large number of other notes and vendors' liens resting upon this same property, and amounting to many thousands of dollars additional. This also took from the Irrigation Company a large quantity of its immovable property, but relieved it of the huge indebtedness mentioned, which appears to have been largely in excess of its value.

The first sale, pursuant to the order of the court, began on January 9, 1915, in St. Landry parish and on January 16th in Evangeline. There was realized in cash therefrom the sum of $24,383.65, and real and personal property was, in addition thereto, bought in by holders of vendors' liens thereon to the amount of $19,919.32, and making total sales of $44,302.95, and which was $7,871.93 less than the appraisement on the inventory of the property thus sold, to wit, $61,014.90.

Thereafter, on January 26th, the court ordered the property remaining unsold reoffered on 12 months' bond for what it would bring, 20 per cent. to be paid in cash, balance secured by bond, vendors' lien, etc. Both the inventories and procès verbals of sales were, by consent, omitted from this otherwise voluminous record, and hence it does not clearly appear just what portions of the property remained on hand after the first sale; but, from the application, we gather that it consisted mainly of the pumping plant, 180 acres of land on which the plant was situated, canals, laterals, rights of way, and a small amount of movable property. On February 13th the second sale was made, and Mrs. Lina Mann, holder of the receiver's certificates, became the adjudicatee of the pumping plant, the tract of land upon which it was situated, main canal and laterals, completed and uncompleted, all consisting of some 52 items on the advertisement of sale, for the price of $5,000. Deviating somewhat from the method pursued as to sales of other property, the receivers in this instance, actuated, we assume by the inconsiderable amount of the bid, applied to the court for a confirmation of the sale to Mrs. Mann, alleging that she had complied with her bid by paying 20 per cent. cash, and executing bond, etc.; whereupon the holders of certain first mortgage bonds upon the property so bid in appeared and opposed the confirmation, on the ground that no mortgage certificate had been produced at the sale, and those present were not informed as to whether the property would be sold free of incumbrances or not; that the price was ridiculously small, and amounted to a confiscation of property which had, according to the opposition, cost more than one-fourth of a million dollars. The adjudica-

tion was eventually set aside by the final judgment of this court on June 30, 1916. 139 La. 843, 72 South. 375.

At the second sale, exclusive of the property bid in by Mrs. Mann, above mentioned, other property was sold for cash amounting to $1,632.25, and on 12 months' bond in the sum of $6,115.50. After the adjudication to Mrs. Mann was annulled, the pumping plant, etc., was reoffered and bid in by J. W. Billinsly for $9,275.

### First Provisional Account.

The first provisional account is apparently divided into two periods, the first period preceding the taking of the second inventory, and the second period following that inventory, as follows:

| | | |
|---|---:|---:|
| The receivers charge themselves with the first inventory .......................... | | $903,489 38 |
| They take credit: | | |
| By property appraised twice.. | $ 1,800 00 | |
| By property foreclosed........ | 153,112 73 | |
| By personal property foreclosed ........................ | 9,587 25 | |
| By real estate to which title was annulled ................. | 272,114 26 | |
| By personal property surrendered by order of court...... | 18,572 50 | |
| By property used in operations | 954 42 | |
| By livestock lost.............. | 605 00 | 456,745 15 |
| Balance, according to first inventory ................................. | | $456,743 23 |

On the second inventory this balance was appraised at $155,370.40.

In addition to the above, the accountants, by Exhibit A, attached to the first provisional account, charge themselves with the funds received on the receiver's certificates, proceeds of crop, sales from commissary, etc., and take credit for expenses of farming operations, etc., as follows:

| | | |
|---|---:|---:|
| Receipts ..................................... | | $29,668 52 |
| Disbursements ................... | $29,129 80 | |
| Balance on hand this source................ | | $ 538 72 |

From this point on the record is rather confusing. On page 263, vol. 1, it is stated that, after the property had been offered for sale, and a large quantity failing to sell, the court ordered a reinventory, which amounted to $155,261.87, consisting of 65 pages omitted from the transcript, and which was completed on December 31, 1914; whereas the record otherwise discloses, as shown above, that the first sale was not held until January 9, 1915 (in St. Landry), and January 16th (in Evangeline). As stated above, both inventories and all of the detailed reports of the auctioneer's sales, were, by consent (we assume in the interest of economy of costs), omitted from the record, and we are therefore unable to check each against the other to see what became of any piece of property. We take it that, if there had been any such discrepancy as would result from the crediting of the proceeds of second sale alone against the second inventory, counsel for opponents would have discovered and pointed it out in their briefs. We therefore assume that the action of the receivers in crediting cash proceeds of both first and second sales, certain additional foreclosures, and sales to vendors of real and personal property, as well as difference between inventory value and purchase price at sale, against the second inventory, must be correct. This, of course, could only be true if the second inventory was made before the first sale.

Adopting this hypothesis, we further interpret the first provisional account as follows:

| | | |
|---|---:|---:|
| To second or reinventory................... | | $155,370 40 |
| By duplications ................ | $ 160 00 | |
| By additional property foreclosed ........................ | 8,680 00 | |
| By cash received first sale.... | 24,385 65 | |
| By cash received second sale.. | 1,632 25 | |
| By property sold on 12-month bond second sale.............. | 6,515 50 | |
| By property sold to holders of vendor's liens first sale...... | 19,919 32 | |
| By property sold to holders of vendor's liens second sale.... | 8,250 00 | |
| By difference between inventory value and sale price at first sale ...................... | 7,871 93 | |
| By difference between inventory value and sale price at second sale ................... | 77,958 75 | |
| | $155,370 40 | $155,370 40 |

In addition to the cash collected in full payment on property sold at first and second sale, as shown above, under the terms of the second sale, 20 per cent. cash was collected on all property sold on 12-month bonds, so that the auctioneer's cash statement, including both sales, shows:

| | | |
|---|---|---|
| Total cash received | | $28,892 50 |
| Less items not collected | $1,686 35 | |
| Less commissions and costs paid and reserved by auctioneer | 4,044 90 | 5,731 25 |
| Balance cash turned over to receivers by auctioneer | | $23,161 25 |

For some reason, which we have not been able to discover in the record, there is a discrepancy between the cash thus shown to have been turned over by the auctioneer to the receivers and the amount which they report as received on the tableaux of distribution of $827.67, and the fees and expenses of the auctioneer are also placed thereon for deduction from the cash thus shown by the accountants, notwithstanding the statement of the auctioneer just above given shows that these items had already been deducted by him, leaving the net amount of cash "due the receivers of $23,161.25." We quote from the tableaux, Exhibit E, as follows:

| | | |
|---|---|---|
| Moneys received from sales, including 20 per cent. of the purchase price of personal property on which vendor's liens are claimed | | $22,333 56 |
| Law charges: | | |
| Balance due on advertising | $ 372 00 | |
| Costs of court | 567 38 | |
| Attorneys' fees | 5,000 00 | |
| Receivers' fees | 5,000 00 | |
| Revenue stamps to be placed on procès verbal | 40 00 | |
| Auctioneer's fees and other expenses deducted by him | 4,044 90 | 15,024 28 |
| Balance from sales | | $ 7,309 29 |

It will be recalled that Exhibit A attached to the account, covering farm operations, showed a balance of $538.72, and it seems to us, therefore, that the portion of the tableaux quoted above should have been as follows:

| | | | |
|---|---|---|---|
| Balance from farm operations | | $ 538 72 | |
| Moneys received from sales, including 20 per cent. of purchase price of personal property on which vendor's liens are claimed (according to auctioneer's report) | | 23,161 25 | |
| Law charges: | | | |
| Balance due on advertising | $ 372 00 | | |
| Costs of court | 567 38 | | |
| Attorney's fees | 5,000 00 | | |
| Receivers' fees | 5,000 00 | | |
| Revenue stamps to be placed on procès verbal | 40 00 | | |
| | $10,979 38 | $23,699 97 | |
| Balance from sales | 12,720 59 | | |
| | $23,699 97 | $23,699 97 | |

As against the balance thus shown, after deducting law charges, the receivers, on this first provisional account, ranked the outstanding receiver's certificates, amounting with interest at that time to the sum of $19,-914.50, as further costs to be paid, and, next in order of preference, listed "privileged claims," including pay roll certificate and claim of Standard Milling Company, aggregating $7,606.87. Next in order were listed creditors with claims as vendors upon movable property, followed by those claiming vendor's liens upon real estate. Then appeared a list of bondholders with mortgages upon real estate, amounting to $757,930. The balance shown to be due on credit sales, or 12-month bonds, was $5,211.20. The account concludes by suggesting to the court that it would be necessary to assess the holders of vendor's liens upon movable property with further sums to pay the court costs.

Numerous oppositions were filed to the account, mainly by the holders of vendors' liens upon movable property, but the lower court finally rendered judgment homologating and approving those items listed as law charges, adding to said judgment the following:

"As there are other assets which will come into the receivership, it is impossible for the court to determine, at this time, the proportion, if any, the holders of vendor's privileges on movable property should contribute to the

payment of costs and the receiver's certificates, and the oppositions are therefore referred to future adjudication, upon the filing of the final account by the receivers, when the court will know exactly the amount of assets in the receivership."

Thereupon an agreement was entered into and signed by the attorneys of record for the opponents, Fairbanks Steam Shovel Company, Rumley Products Company, International Harvester Company, and Harry Bros. Company, limited, and by the attorneys for the receivers, in which it was stipulated that, whereas the opponents were aggrieved by the judgment mentioned, in order to "prevent appeals * * * the receivers of the Union Irrigation Company do hereby bind and obligate themselves to keep the said proceeds [of opponents' property] subject to said vendors' liens intact and separate until our final account is filed, and to give the" counsel for opponents notice, together with copies of said final account 5 days before filing same. No appeals, therefore, were taken from the judgment homologating the first provisional account.

### Second Provisional Account.

The second provisional account charges the receivers with amounts received and on hand, as follows:

| | |
|---|---:|
| Balance on hand as per last account | $ 7,309 28 |
| Difference between amount reserved for revenue stamps $40, and amount actually paid $9 | 31 00 |
| Proceeds of sale of material purchased by receivers and sold at receivers' sale | 35 55 |
| Error in amount in separate account as 80 per cent. of the proceeds of vendor's lien property | 922 00 |
| Cash in bank received from receivers' certificates, which is shown on Exhibit A of first provisional account as follows: | |
| In Hibernia Bank & Trust Company $524 90 | |
| In Washington State Bank 13 82 | 538 72 |
| Net receipts since filing last account up to 1917, as shown upon Exhibit A hereto attached, including amount received from sale of property | 12,118 61 |
| Total | $20,855 16 |

Of this amount $3,878.46 represented the

cash payment of 20 per cent. which the International Harvester Company, Harry Bros. Company, Rumley Products Company, Fairbanks Steam Shovel Company, Schoelkoff Saddlery Company, Western Wheeled Scraper Company, and Leon Wolff were required to pay on their bids for movable property upon which they claimed vendor's liens, leaving the sum of $16,976.60, which the receivers proposed, on the account, to distribute as follows:

| | | |
|---|---:|---:|
| Amount for distribution | | $16,976 60 |
| Amount due on receivers' certificates, law charges and preferred claims: | | |
| Receivers' certificates | | |
| —Principal $18,000 00 | | |
| Accrued interest on same 4,856 20 | $22,856 20 | |
| Due Foster, Milling, Saal & Milling | 174 66 | |
| For court costs, etc | 2,000 00 | |
| Attorneys' fees | 2,000 00 | |
| Receivers' fees | 1,000 00 | |
| Accountant's salary and expenses | 500 00 | |
| Sundries | 2 36 | 26,533 32 |
| Deficit | | $ 9,556 52 |

In order to make up this deficit, the receivers proposed that an assessment of 26.63 per cent. be made against the proceeds of personal property sold on which vendor's liens were asserted, against the following creditors, to wit:

| | Adjudication | Assessment |
|---|---:|---:|
| International Harvester Company | $2,668 10 | $ 710 52 |
| Harry Bros. Company of Louisiana | 110 00 | 29 29 |
| Rumley Products Company | 3,032 00 | 807 42 |
| Fairbanks Steam Shovel Company | 13,334 00 | 3,550 85 |
| Schoelkoff Saddlery Company | 58 70 | 15 63 |
| Western Wheeled Scraper Company | 138 50 | 36 88 |
| Leon Wolff | 45 00 | 11 98 |
| Marion Steam Shovel Company | 16,500 00 | 4,393 95 |
| Total amount to be assessed | | $9,556 52 |

The account further shows that there is due the receivers by the auctioneer $112.10 for property sold to J. Franklin Schell, and for which no collection was made, and that there is an outstanding claim against P. T.

Blackshear and the surety on his injunction bond of $1,620.56 yet to be settled by suit.

Oppositions to this second provisional account were filed by the International Harvester Company, Harry Bros. Company, Rumley Products Company, Fairbanks Steam Shovel Company, and Marion Steam Shovel Company, all similar in character, and in which it was alleged that the receivers proposed to assess against them, as holders of vendors' liens on movable property, a very large proportion of the entire costs of these proceedings, including attorneys' and receivers' fees, and have not assessed nor proposed to assess any part thereof against the numerous creditors who asserted vendors' liens upon immovable property, thereby making their burdens largely in excess of what they should be called upon to bear. They specially opposed the receivers' certificates, with interest, in the order in which they are sought to be paid by preference over said holders of vendors' liens upon movable property; that said certificates are not valid obligations of the receivership for the reason that the same bear upon their face limitations and qualifications which propose to exempt holders of vendors' liens on the real property from all liability for any of the costs and expenses of the receivership, and to unjustly throw upon the holders of vendors' liens upon movable property the entire burden of the costs and expenses of administration. They further opposed the attorneys' and receivers' fees, on the ground that they were excessive, and for the further reason that the claimants thereof had already been paid sufficiently for their services rendered to the receivership and that the receivership had been carelessly and recklessly managed, resulting in great losses to the estate of the Union Irrigation Company. They further alleged that the order rendered on May 30, 1914, purporting to exempt the holders of vendors' liens upon real estate from contribution to the costs and expenses of the receivership, including the payment of receivers' certificates, attached and made part of said certificates, was illegal, null and void for the reason that same was signed by the judge without having been placed upon the receivership book for 10 days, or any other period of time, when there was no legal or valid reason for such haste, and cannot, therefore, bind said opponents; and that said order is further illegal and void for the reason that it makes an inequitable and wholly *unjustifiable distinction between the holders vendors' liens upon movable* and immovable property of the Irrigation Company, the holders of vendors' liens upon the real estate never having complied with the condition of said order by withholding foreclosure upon the company's property as was therein contemplated and provided.

For further oppositions they alleged that a large number of creditors with vendors' liens on movable property had had the same turned over and delivered to them by the receivers, under arrangements by which distinctions and discriminations were made against opponents, in that, in many instances, said property was returned without the payment of any sums whatever toward the costs of the receivership, and with the express understanding that they should not be liable therefor, all to the serious prejudice of the rights of opponents.

The Planters' National Bank, as the assignee of J. Franklin Schell, also opposed said account on the ground that their claim had not been placed on the account as a privileged claim, which they alleged should have been done, for the reason that it represented wages due Schell as overseer and general manager of the planting operations by the receivers.

On these issues the matter was submitted to the court below, and there was judgment

striking from the second provisional account the items of additional receivers' fees of $1,000 and accountant's fees of $500, and holding that certificate No. 6, sold after the passage of Act No. 199 of 1914, could not prime the vendors' liens on personal property, and subordinating it to the claims of the opponents. In all other respects the account was homologated and approved.

In the matter of the opposition of the Planters' National Bank, the lower judge recused himself, and the same was tried by a judge ad hoc, who ordered the receivers to amend the account by placing thereon the judgment of this opponent as a privileged claim.

Appeals were prosecuted, both by the receivers and the following opponents, to wit: Fairbanks Steam Shovel Company, International Harvester Company, Harry Bros. Company, Limited, Marion Steam Shovel Company, and Planters' National Bank.

## Opinion.

As indicated by the judgment on the first provisional account quoted from above, it did nothing more than approve the items of law charges placed thereon, and referred to a future adjudication the question of whether or not the proceeds of personal property upon which vendors' liens were claimed should be compelled to contribute to the payment of costs of the receivership; and, in order to eliminate any doubt on the score of the right to contest this last issue, an agreement was entered into by the attorneys for the receivers and the opponents to the effect that, in order to prevent any delay in the payment of the law charges approved on said account, no appeal would be taken by the opponents, on condition that said items should "in no wise impinge upon the special funds subject to their liens or in prejudice to their rights in any way, but the question of whether these funds or any portion thereof shall bear a proportion of the costs and charges of the receivership shall be determined by the judgment on the final account to be filed by the receivers." So that the issue thus reserved cannot in any sense be said to have been foreclosed or determined by the judgment on the first provisional account.

[1, 2] Taking up first the law charges and court costs, such as advertising bills, receivers' and attorneys' fees on the first provisional account, even if the failure to appeal from the judgment approving these items would not preclude their further investigation at this time on an opposition to the second provisional account, we think the opponents have shut off whatever right they may have had on that score by expressly consenting to the execution of the judgment in that respect, as disclosed by the stipulation quoted above. Hence we do not think that those matters are now before us for determination. And again, as to the matter of fees of the attorneys, receivers, and accountant, claimed on the second provisional account, we think the judge under whose eye the services were performed was in a better position to judge of their nature and importance to the receivership than we are, and we should be disposed to interfere only where that conclusion was manifestly wrong. It is true that the outcome of this receivership has been very disastrous for all concerned, but we think that that result was caused, not by any fault of the receivers or their attorneys, but by the involved and confused condition of the corporation's affairs when they took charge, and which, apparently, was not discovered until the court had, after proper application, ordered the receivers to undertake the raising of a rice crop. From the voluminous nature of the record, and considering the many and complicated matters which they were called upon to handle, it is apparent that a great deal of work and labor was required, and we think that the court

below has given reasonable consideration to the unfortunate outcome, in the sums allowed for the services performed, and we shall not disturb his finding on that score.

[3] With respect to the failure of the holders of vendors' liens upon real or immovable property to contribute to the costs of the receivership, it is sufficient to say that they never consented to or acquiesced in the appointment of the receivers, or of their administration; but, on the contrary, in the face of strong efforts on the part of the receivers and the court to have them do so, they persisted in foreclosing on their claims, and in applying the property subject to their liens to the payment of their debts. This they had a right to do, in view of the nature of their claims; and only by sitting quietly by and permitting the receivers to administer the estate without such assertion could they have been made liable for any part of such expense. Teutonia Bank & Trust Co. v. Security Brewing Co., 137 La. 1046, 69 South. 833; Borne v. Alexander Hardwood Co., 140 La. 323, 72 South. 979. Therefore they were not liable for such costs, and the order of the court complained of, in which it was directed that, in consideration of their agreeing to postpone foreclosure upon their liens until the crop could be made and harvested, they should be relieved from contributing to the costs of the receivership, did not in any wise diminish their rights, or increase the burdens of the opponents or any one else, who, on the other hand, acquiesced in the farming operations undertaken by the receivers. The result, both in fact and in law, was the same as if the order in question had never been made.

The opponents also complain of the action of the court, at the instance of the receivers, in returning certain immovable property to the holders of vendors' and other liens thereon, to wit:

(1) July 27, 1914, an automobile was given to the Abbott Motor Company, of New Orleans, in payment of a repair bill of $400 and in consideration of the surrender to the receivers of the Irrigation Company's note for $775, due February 1, 1914, with interest from date, and the cancellation of the Motor Company's claims against the company.

(2) September 29, 1914, the receivers applied for authority to turn over to the Farmers' Bank & Trust Company certain farm implements on which it held a chattel mortgage, securing notes given by the purchasers thereof from the Irrigation Company, which company had sold the notes to the bank. The makers of the notes having returned the property thus mortgaged to the receivers, they, in turn, delivered it to the bank.

(3) September 19, 1914, application was made for permission to return to J. D. Adams & Co. two road machines, which cost $1,400, and on which $505.89 had been paid, in consideration of the surrender by Adams & Co. of the Irrigation Company's note for $894.11 and the payment of $125 cash to the receivers.

(4) November 18, 1914, permission was sought for the effecting of a compromise with Dr. John A. Haas of a chattel mortgage on 29 head of mules held in his possession, together with a mortgage on 23.03 acres of the company's lands, to secure an indebtedness of $4,000. Haas agreed to accept the mules in full payment, and to surrender the Irrigation Company's note for $827.90, secured by the mortgage upon the land.

(5) October 19, 1914, receivers applied for permission to return to Klingman Plow Company, certain farm implements, on which there was due a balance of $2,016.22, in consideration of the payment to the receivers of $150 in cash and the cancellation of all further liability.

(6) November 11, 1914, one Edwards applied to have road machine sold to the Irri-

gation Company, and which had never been accepted by it, returned to him, upon cancellation of the claim of $75.

(7) November 11, 1914, the Underwood Typewriter Company sought the return of a duplicator to it, upon cancellation of its claim.

[4] In each and every one of the instances mentioned above the application was regularly and formally made, spread upon the receivership book for the requisite length of time, and finally approved by order of the court, after no opposition thereto had been made. It will be noted that in all but three of these instances (those taking place in November) the action was taken before the corporation had been formally declared insolvent by the court, which was done on October 29, 1914; and that, even after this was done, the second inventory, completed December 31, 1914 (whether taken before or after the first sale), showed the receivers in possession of property valued at $155,261.87, which would have been many times the amount necessary to pay costs and expenses of the receivership had the property brought anything like its value. In view of these circumstances, the matters complained of having been handled in strict accord with the provisions of the receivership statute, without any objection from these opponents or any one else at the time when every opportunity had been afforded for them to do so if they had seen fit, we do not think that the reasonable and just costs of the receivership should be disallowed against the funds now in the hands of the court simply because subsequent developments produced such disastrous results as to require the calling upon the opponents to contribute thereto in the manner sought by the account. It is very much like the expression used in the rural sections: "Those who stay through the dance have to pay the fiddler."

Inasmuch as Act 199 of 1914, subordinating the lien of receivers' certificates to that of vendors upon movable property, had become effective when the last certificate of $5,000 was negotiated to Mrs. Mann, or when the money thereon was advanced, we think the ruling of the lower court ranking it secondarily to the claims of the opponents upon the proceeds of their property was correct. The situation would be different if it had been negotiated and the money advanced before the act became effective.

In conclusion, we think that the last provisional account should be amended so as to add thereto and to charge the receivers with the errors of $827.67 difference between the cash turned over to the receivers by the auctioneer from the first two sales and the amount with which they charge themselves on the first provisional account, and also the deduction of the auctioneer's commissions and expenses from the cash so received, when the latter had, in his cash statement rendered to them, already made this deduction of $4,044.90, as heretofore pointed out. The item of $538.72, resulting from farm operations, and omitted from the first account, has been included in the second. So that the second provisional account should be so amended as to charge the receivers with $12,181.87, as being on hand from the first account, instead of $7,309.28. As hereinabove stated, the judgment on the first account did nothing more than approve the law charges and costs and order them paid; and, while the item of auctioneer's commissions and expenses was approved thereon, this did not have the effect of perpetuating the error which, in our opinion, thus appears from the record.

For the reasons assigned, the judgment appealed from is amended so as to charge the receivers with the said sum of $12,181.87, as remaining from the first provisional account, instead of $7,309.28 as appears on the second

provisional account, and, as thus amended, the judgment of the lower court is affirmed. The receivers to pay the costs of this appeal.

## On Rehearing.

LAND, J. The order granting the rehearing in this case reads as follows:

"International Harvester Company of America v. Union Irrigation Company. The receiver's application for a rehearing is granted only upon the following questions, viz.: (1) Whether the claim of the Planters' National Bank, as subrogee of J. Franklin Schell, for $1,200 for wages or salary alleged to have been due to Schell is secured by a lien or privilege, and, if so, what is its relative position or rank with reference to other claims upon the funds to be distributed. (2) Whether there was error in the ruling that the receivers should have charged themselves with $867.67 more as the amount turned over by the auctioneer as proceeds of the first and second sales. (3) Whether there was error in the ruling that the receivers should not have deducted from the amount received from the auctioneer $4,044.90 for commissions and expenses. (4) Whether Act 199 of 1914 affected the receiver's certificate No. 6.

"The International Harvester Company's application for a rehearing is granted only upon the question whether the judgment dated May 22, 1915, shall have the effect of exempting the proceeds of the sale of the machinery sold by the company from the payment of any other costs or charges other than the costs of the public sale of that property. The application for rehearing filed jointly by the Marion Steam Shovel Company, Fairbanks Steam Shovel Company, and Rumley Products Company is granted only upon the question whether the amount of the costs or charges to be contributed by each opponent shall, if possible, be fixed by the decree of this court. In all other respects, all of the applications for rehearing are refused."

1. Whether the claim of the Planters' National Bank as subrogee of J. Franklin Schell for $1,200 for wages or salary alleged to have been due to Schell, is secured by a lien or privilege, and, if so, what is its relative position or rank with reference to the other claims upon the fund to be distributed.

The instrument by which the claim of J.

Franklin Schell was transferred to the Planters' National Bank, reads as follows:

"The claims being transferred are the amount due me as general manager of the said Union Irrigation Company to November 1, 1913, amounting to the sum of three thousand fifty and 30/100 dollars, and the further sum of twelve hundred dollars due me as general manager and overseer from November 1, 1913, up to May 1, 1914, and which last amount is privileged on the crop of 1914."

On May 27, 1915, the receivers filed their first provisional account, and the Planters' National Bank of Opelousas, appearing as the transferee of Schell's claim, filed an opposition thereto, claiming the entire amount with privilege; but, by judgment of July 9, 1915, all oppositions "were referred to future adjudication, upon the filing of final account." On April 1, 1918, the receivers filed their second provisional account, and the bank filed an opposition claiming only $1,200 with privilege, and the judge ad hoc (the presiding judge having recused himself) gave judgment for that amount, "to be paid out of the proceeds of the crops of 1914 in preference to all other creditors," and in our former decree we affirmed this judgment.

[5] The judgment appointing the receivers was rendered April 30, 1914, and, as the $1,200 claim of Schell for wages as general manager and overseer was for services rendered from November 1, 1913, up to May 1, 1914, it is clear that Schell's claim is based upon services rendered prior to the receivership, and could not outrank the costs of the receivership, nor could it be a privilege superior to the vendor's privilege upon the movables.

Section 5 of Act 159 of 1898, as amended and re-enacted by Act 212 of 1910, as amended and re-enacted by Act 199 of 1914, answers that question in favor of the debts represented by the receivers' certificates, which, by the Act of 1910, "bear a privilege on all of the property real or personal and the income of the corporation to be paid by

preference and priority over all other creditors," save the vendor's lien and privilege which may be outstanding, due and owing at the time the certificates are issued. It therefore follows that the privilege of an overseer upon the year's crop for balance of salary is primed by the vendor's privilege and by that of the holder of a receivers' certificate.

2. Whether there was error in the ruling that the receivers should not have deducted from the amount received from the auctioneer $4,044.90 for commissions and expenses.

The portion of the first provisional account of the receivers which it is necessary for us to consider is as follows:

| | | |
|---|---:|---:|
| Moneys received from sales, including 20 per cent. of the purchase price of personal property on which vendors' liens are claimed | | $22,333 66 |
| Law charges: | | |
| Balance due on advertising | $ 372 00 | |
| Costs of court | 567 38 | |
| Attorney's fees | 5,000 00 | |
| Receivers' fees | 5,000 00 | |
| Revenue stamps to be placed proces verbal | 40 00 | |
| Auctioneer's fees and other expenses deducted by him | 4,044 90 | 15,024 28 |
| Balance from sales | | $ 7,309 28 |

The auctioneer's cash statement, including both sales, shows:

| | | |
|---|---:|---:|
| Total cash received | | $28,892 50 |
| Less items not collected | $1,686 35 | |
| Less commissions and costs paid and reserved by auctioneer | 4,044 90 | 5,731 25 |
| Balance cash turned over to receivers by auctioneer | | $23,161 25 |

It will be observed from the above that there is a discrepancy between the amount of cash received by the receivers, as stated in their provisional account, and the amount paid them, as shown by the auctioneer's cash statement, of $827.59, or the difference between $23,161.25 and $22,333.66.

It will also be observed that the amount of $23,161.25 was the net cash balance paid over to the receivers, after deducting the commissions and costs reserved by the auctioneer,

amounting to $4,044.90, yet in the provisional account of the receivers we find this sum of $4,044.90 again deducted from the $22,333.66, which is already short the sum of $827.59, making a total of $4,872.49 apparently not accounted for in the provisional account, and which, added to the balance shown by said account of $7,309.28, would make the balance of these sales $12,181.77. We therefore, in affirming the judgment appealed from, amended the same, so as to charge the receivers with the sum of $12,181.77, as remaining from the first provisional account, instead of $7,309.28, as appears on the second provisional account. In this we erred, for the reason that, however misleading the account of the receivers may appear on its face, yet, if we take the gross amount of the sales made by the auctioneer amounting to $28,892.50, and then deduct from this sum the admitted credits, the balance on hand necessarily proves that the balance as stated in the receivers' account is correct as it gives the same result, $7,309.28.

To illustrate:

The auctioneer's cash statement, including both sales, shows:

| | | |
|---|---:|---:|
| Total cash received | | $28,892 50 |
| Less items not collected | $1,686 35 | |
| Less commissions and costs paid and reserved by auctioneer | 4,044 90 | |
| The receivers held in separate accounts as 80 per cent. of the proceeds of vendor's lien movables sold to third parties | 4,837 04 | |
| Proceeds of supplies not used by receivers | 35 55 | |
| Law charges: | | |
| Balance due on advertising | 372 00 | |
| Costs of court | 567 38 | |
| Attorneys' fees | 5,000 00 | |
| Receivers' fees | 5,000 00 | |
| Revenue stamps to be placed on proces verbal | 40 00 | 21,583 22 |
| Balance from sales | | $ 7,309 28 |

This demonstrates the correctness of the balance stated in the receivers' first provisional account.

[6] 4. Whether Act 199 of 1914 affected the receivers' certificate No. 6.

Section 5 of Act 159 of the Acts of the General Assembly of 1898, as amended by Act 212 of 1912, and as amended by Act 199 of 1914, reads in part as follows:

"In the order appointing such receivers, the court may * * * authorize any receiver of any corporation, in order to carry on the business of the corporation, to borrow or obtain money on certificates of indebtedness to be taxed as costs of court. The sum so obtained shall bear a privilege on all of the property real or personal and the income of the corporation to be paid by preference and priority over all other creditors of the corporation, save the vendor's lien and privilege which may be outstanding due and owing at the time the certificates are issued, which vendor's lien and privilege shall remain unimpaired and retain its present status as provided for by existing laws."

This act was approved July 9, 1914.

When judgment was rendered placing the corporation in the hands of a receiver, it appointed J. Franklin Schell and William Edenborn as receivers, and it required them to proceed at once with the farming operations, and authorized the issuing of $50,000 of certificates. The court immediately issued certificate No. 1 for $5,000, dated April 30, 1914.

On May 30, 1914, the court modified this order issuing $50,000 of certificates, and on June 5, 1914, there was issued $16,000 additional certificates of this authorized issue of $50,000, which were numbered 2 to 6, respectively, and were in denominations as follows: No. 2, $2,000; No. 3, $2,000; No. 4, $2,000; No. 5, $5,000; and No. 6, $5,000. An ineffectual effort was made to negotiate these certificates to banks in Opelousas and New Orleans, and afterwards Mrs. Mann agreed to take them, on the condition of being secured by the personal guaranty of the receivers. She took these certificates on June 11, 1914, six days after they had been issued, and on that day the receivership was credited with the $16,000, being the full face value of said certificates, as shown by the receivers' statement of receipts and disburse-

ments from May 1, 1914, to May 1, 1915; the credit being entered of date June 11, 1914, for "Receivers Certificates Nos. 2-6, $16,000."

In other words, the money was loaned on these certificates by Mrs. Mann, the transaction was consummated, and the credit finally obtained on June 11, 1914, or nearly 30 days prior to the passage of Act 159 of 1914, which was approved July 9, 1914. The mere fact that the receivers did not require her to advance all of the money at one time, but waited until it was needed, September 11, 1914, when $3,000 was advanced, and until October 23, 1914, when $1,000 was advanced, is immaterial, as only a credit would have been obtained if the whole $16,000 had been paid by Mrs. Mann, and the receivers had deposited the money in the bank. If a commission merchant should allow a planter a credit of $16,000 on the first of January, 1914, to make a crop for the current year, it could not be seriously argued that the contract of loan in such a case was not consummated until the last advance of this sum was actually made.

So, in the present case, the loan having been finally made, and the credit actually given, before the passage of Act 159 of 1914, the contract between the receivers and Mrs. Mann became definitive and irrevocable, and its obligation could not be impaired by any subsequent legislation on the subject. We therefore conclude that the receivers' certificates held by Mrs. Mann represent a debt which did not fall under the dominion of said act, but enjoys a privilege which primes that of the vendors, whether of immovables or movable property.

5. Shall the judgment dated May 22, 1915, have the effect of exempting the proceeds of the sale of the machinery sold by the company from the payment of any other costs or charges other than the costs of the public sale of that property?

The judgment is as follows:

"It is further ordered, adjudged, and decreed

that plaintiff's vendor's lien and privilege on the articles described in the exhibits filed with his petitions be recognized and enforced, and that the petitioner be paid from the proceeds of the sales of said articles made by the receivers, in preference and priority over all other claims or demands in reference thereto, saving the rights of any third parties to assert such claims or demands as they may present to the court prior to the payment by the receivers, in or to such proceeds."

More than a year elapsed from the issuing of the first receivers' certificate to the time of rendering the judgment recognizing the privilege of the International Harvester Company as vendor of the movables sold. The receivers were appointed April 30, 1914; certificate No. 1 for $5,000 was issued April 30, 1914; certificates Nos. 2–6 for $16,000 were issued June 11, 1914; application and order to sell property October 14, 1914; property sold January 9, 1915; judgment of International Harvester Company recognizing its privilege was rendered May 22, 1915.

[7] The vendor of movables is entitled to have the property upon which his privilege rests, seized and sold forthwith, and the proceeds distributed immediately by the receiver in a provisional account filed by said receiver, in which the proceeds of the sale only will be distributed. Hudson & Sons v. Uncle Sam Planting & Mfg. Co. et al., 136 La. 1071, 68 South. 139.

Instead of exercising this summary remedy, in which case it would have incurred the costs only of this particular sale and proceeding, the International Harvester Company permitted its property upon which it had a privilege to remain under the dominion, control, and operation of the receivership, taking the risk of such experiment, and therefore it subjected its property to the costs and charges of the receivership, the same as other creditors pursuing the same course. Teutonia Bank & Trust Co. v. Security Brewing Co., 137 La. 1046, 69

South. 833; Borne v. Alexander Hardwood Co., 140 La. 323, 72 South. 976.

[8] The judgment of May 22, 1915, does not purport to confer the advantage claimed by the International Harvester Company over other creditors, as to the payment of costs of the receivership, since it contains the saving clause, "the rights of any third parties to assert such claims as they may present to the court, prior to the payment by the receivers, in or to such proceeds."

6. As to whether the amount of the costs or charges to be contributed by the Marion Steam Shovel Company, Fairbanks Steam Shovel Company, and Rumley Products Company shall be fixed by the decree of this court.

Three years have elapsed since the judgment appealed was rendered, and it is to be hoped that the various matters which were unsettled at that time have now been disposed of and definite results so far attained as that it will be possible to ascertain in the district court, the exact amount of the deficit, if deficit there should be, to be made good by the levy of a pro rata assessment upon the proceeds of all movables sold in the receivership, which are subject to vendors' liens; but, as the case is now presented, the fixing and pro rating of such assessment cannot be accomplished in this court.

Our former decree is amended, by placing upon the second provisional account of the receivers, certificate No. 6 for $5,000, held by Mrs. Mann, as a claim priming that of the holders of vendors' liens on movables, and by placing upon said provisional account the privilege of the Planters' National Bank for $1,200 subordinate in rank to that of the holders of receivers' certificates, and of vendors' liens on movables, and so as to charge the receivers with the sum of $7,309.28 instead of $12,181.77 as remaining from the first provisional account, and as appears on the second provisional account, and our for-

mer decree as amended is reinstated and made the final judgment of the court.

DAWKINS, J., dissents from the allowance of certificate No. 6 as a preference.