ST. PAUL, Justice.
 

 The trial judge has thus stated and disposed of the issues involved in this ease:
 

 Reasons for Judgment.
 

 The record shows that on March 6, 1926, A. I. Picard was appointed receiver of the Clover Ridge Planting & Manufacturing Company, and promptly qualified as such. The controversies in this ease consist of oppositions to a provisional account filed by the receiver, in which he proposes a distribution of cash in his hands amounting to $69,055.84. Of this amount the sum of $68,643.84 was collected from various insurance companies in
 
 *307
 
 settlement of the loss of the Clover Ridge factory situated on the Clover Ridge Plantation, which was destroyed hy fire on May 22, 1930, while in the hands of the receiver.
 

 By agreement of all parties in interest this .amount was deposited in the Canal Bank
 
 &
 
 Trust Company to remain in escrow until the rights of the various parties to this litigation should be judicially determined.
 

 The issues involved herein have been ably and exhaustively discussed, both in argument and briefs by counsel representing the respective litigants; and I have arrived at the conclusions herein stated, after a very careful study of the briefs and of the authorities cited by counsel.
 

 There was offered in evidence a stipulation of facts signed by attorneys of all parties to this ltiigation with the exception of Woodward, Wight & Co., and it appears from this stipulation and from other evidence that the Canal Bank & Trust Company is the holder and owner of the note of the Clover Ridge Planting & Manufacturing Company, dated February 3, 1926, for the sum of $102,-500, which on May 22, 1930 (the date of the loss by fire), amounted, in principal and interest, to the sum of $105,2Í0.29.
 

 It also appears that said note is secured by pledge of seven first mortgage notes of $5,000 each, which on May 22, 1930, amounted (in principal and interest) to $38,818.90, which mortgage notes were part of a series of twelve mortgage notes aggregating in principal $60,000, all dated January 11, 1921, and secured by first mortgage on said Clover Ridge plantation.
 

 It also appears that the Canal Bank & Trust Company is the holder and owner of notes of Picard & Geismar; which on May 22, 1930, amounted in principal and interest, to the sum of $45,069.32, and that said notes of Picard & Geismar, are secured by pledge of five mortgage notes of $5,000 each, which are of the same series as the seven mortgage notes pledged to secure the above-mentioned note of the Clover Ridge Company, and which are, therefore, also secured by first mortgage on Clover Ridge plantation.
 

 It also appears from said stipulation that on May 22, 1930, said five mortgage notes amounted'in principal and interest to $39,-727.77.
 

 The act of mortgage with which the above-mentioned mortgage notes (pledged as collateral) are identified, contains a clause which reads as follows:
 

 “The said mortgagor hereby agree and binds itself to cause improvements on the property hereinabove described insured in the sum of $100,000.00 until the full and final payment of the note herein given and to have the policy or policies made payable to said mortgagee or holder of said note as his interest may appear and to place said policy in the keeping of said mortgagee, or holder of said note, and in default thereof said mortgagee or holder of .said note is authorized to have said insurance effected at the cost of said mortgagor, who hereby mortgages said property in the sum of $2500.00 to secure any amount paid out for that purpose.”
 

 A. I. Picard, receiver of the Clover Ridge Planting & Manufacturing Company, is named as the assured in all of the policies that were in force at the time of fire, and the policies all contain a clause which reads as follows:
 

 
 *309
 
 “Any loss proven to be due the assured under this policy is held payable to the holder or holders of first mortgage notes as their interest may appear, subject, however, to all the conditions of this policy; balance, if any payable to the assured.”
 

 • The evidence shows that the receiver complied with the requirements of the clause just quoted, to the extent of keeping the sugar factory on said plantation insured for various amounts, and by placing the policies containing the said “loss payable clause” in the keeping of the Canal Bank.
 

 It appears, however, that in the early part of the year 1930, the receiver found that he was no longer able to pay the premiums on said policies of insurance, and, when notified by the insurance agent that the policies would be canceled unless the premiums were paid,' he suggested to the agent (who was his brother, Mr. H. M. Picard) that he take up the matter of insurance with the Canal Bank. Following the suggestion of the receiver, the insurance agent entered into an agreement with the Canal Bank by which all the policies of insurance that had been taken out by the receiver (and which were then in the possession of the bank) would be regarded as being in force from and after February 1, 1930, in consideration of payment of premiums made by the bank. The bank did not agree to pay and did not pay any premiums or parts thereof that had been earned by the insurance companies prior to February 1. 1930, but only made such payments as were necessary to pay for insurance commencing as of date February 1, 1930. Nevertheless, it will be noted that all policies for which the bank paid premuims and all policies that were in force at the time of the loss were the policies that had been applied for and taken out by the receiver.
 

 It appears that the insurance that was actually in force at the time of the loss had in fact been partly paid for by the receiver, but it cannot be said that any particular premium had been paid by the receiver, for the reason that the receiver appears to have kept no separate account of payments on the respective policies, but earned a general insurance account with insurance agent through whom the insurance was effected. See Transcript of evidence, pages 61 and 62.
 

 For the purpose of this decision, however, I do not think it matters what premiums or portions of premiums were paid by the receiver and what by the Canal Bank. The contracts of insurance show that the receiver was the assured, and although no decision has been cited which is directly in point in every detail with the case at bar, I am satisfied that the amounts collected in payment for the loss constitute an asset of the receivership, and that the status of the Canal Bank under the provisions of the “loss payable clause" embodied in the various policies is that of a conditional appointee of the mortgagor.
 

 It is contended by counsel for the Canal Bank & Trust Company that said bank, as holder of first mortgage notes, is entitled to receive the entire proceeds of said policies of insurance, since its claims are largely in excess of said proceeds. Other creditors, however, contend that they are entitled to have their claims paid out of the proceeds of said insurance by preference over the claims of the Canal Bank, first, because the rights of the
 
 *311
 
 bank as the holder of first mortgage notes have been by special'agreement subordinated to the rights of the holders of receivers’ certificates ; and second, because the Canal Bank knew of the contemplated appointment of a receiver, and has at all times since the appointment of said receiver had intimate knowledge of the operations of the receivership as a going concern, and has acquiesced therein, and that for this and other reasons set out in a plea of estoppel filed herein, the said bank is estopped from asserting any claim under its mortgage notes superior or 'prejudicial to the privileged claims of said creditors.
 

 It appears from the stipulation of facts and from other evidence that the Marine Bank & Trust Company and Canal Bank & Trust Company merged on July 3, 1928, and it appears from the evidence that Mr. L. M. Pool was president of the Marine Bank & Trust Company prior to the time and at the time when the receiver was appointed, and that when the merger between said two banks took place, Mr. Pool, simultaneously with the merger, became vice president of the Canal Bank & Trust Company. Transcript of evidence, page 76.
 

 It also appears that the above-mentioned note of the. Clover Ridge Company Amounting to §102,500 and held by the Canal Bank, and the said mortgage notes pledged to secure same, were originally held by the Marine Bank and were taken over by the Canal Bank as a result of said merger.
 

 It also appears that said principal nóte for §102,500 was dated February 3, 1926, and was payable on demand, “or if no demand is made then in 224 days after date”; and it appears that the mortgage notes pledged as aforesaid were dated - January 11, 1921, and were all payable in one year, from date. It follows, therefore, that all said notes were due and exigible at the time when the Canal Bank acquired same from the Marine Bank, as a result of the merger on. July 3, 1928, and that said notes were also exigible prior to and at the time when the Clover Ridge Company was placed in the hands of a receiver on March 6, 1926. It may be well to note here also that said note of the Clover Ridge Company amounting to §102,500, although payable to the order of the Marine Bank, does not bear the indorsement of that bank, and therefore, under section 49 of Negotiable-Instruments Act (Act No. 64 of 1904), the Canal Bank & Trust Company, as the transferree of the Marine Bank, is not a holder in due course, and that under section 58 of said act said note is subject to the same defenses as if it were nonnegotiable.
 

 It appears to be settled in our jurisprudence, that, when two corporations are consolidated or merged into one, the effect -of such consolidation or merger is to terminate .the existence of the original corporation and to create a new corporation and to operate as a transfer of the property, rights and liabilities of each of the original corporations to the new one.
 

 “The consolidated corporation not only as- ’ sumes duties and obligations similar to those of the former corporations, but, as a general rule, will be held to the very identical liabilities and obligations incurred by either of the former companies.” See Board of Administrators, etc., v. New Orleans Gas-Light
 
 *313
 
 Company, 40 La. Ann. 382, 4 So. 433, and authorities there cited.
 

 It also appears to be the uniform jurisprudence that “the knowledge which a managing official of a corporation gained as to certain facts and conditions, while a like official of the predecessor of said corporation, is imputable to the latter.” See Blue Diamond Plaster Co. v. Industrial Commission, 188 Cal. 403, 205 P. 678, 681, and authorities there cited. See, also, L. & N. R. R. Co. v. Central Kentucky Traction Co., 147 Ky. 513, 144 S. W. 739, Ann. Cas. 1915A, 857.
 

 The evidence shows that the Marine Bank through its president, Mr. Pool, was fully aware of the financial condition of Clover Ridge Company prior to and at the time when the receiver was appointed, and that it was on the advice of Mr. Pool that an application for the appointment of a receiver was made; that at all times after the appointment of a receiver, and until the merger of said banks, Mr. Pool, in his capacity as president of said Marine Bank, was in very close touch with the affairs of the receivership, and that from and after the date of the merger Mr. Pool, in his capacity as vice president of the Canal Bank, was fully informed up to the time of his death as to the affairs and operations of the receivership. Transcript of evidence pages 46, 76, 103, 104, and 107.
 

 Moreover, there has been offered in evidence a letter to A. I. Picard, receiver, from L. M. Pool, written in his capacity of president of the Marine Bank, which reads as follows:
 

 “New Orleans, La., December 30th, 1927.
 

 “A. I. Picard, Receiver, Clover Ridge Pltg. & Mfg. Co. Inc., New Orleans, La.
 

 “Dear Sir: We have taken cognizance of a petition presented
 
 by
 
 you as receiver to the 18th Judicial District Court of the parish of Iberville in the matter of the receivership of Clover Ridge Pltg. & Mfg. Co. Inc., #272 of the docket of said Court, in which petition was filed on November 10th, 1927.
 

 “We have also taken cognizance of the order of court, by which you are authorized to issue receiver’s certificate aggregating $25,-700.00 to be subordinate in rank to receiver’s certificates presently outstanding and issued under prior orders of the Court aggregating $22,500.00. The order of court we note, was executed on November 26th, 1927. This is to confirm our advice to you that we, as a mortgage creditor of said Clover Ridge Pltg. & Mfg. Co. Inc., have consented to issuance of certificates by you as Receiver, aggregating $25,700.00 under the above mentioned order and petition, and that we will take no action looking to a foreclosure of this mortgage prior to the 31st day of December 1928.
 

 “We further agree that said certificates aggregating $25,700.00 shall be paid by preference and priority over our mortgage, out of the assets of said corporation.
 

 “Yours very truly,
 

 “Marine Bank & Trust Co.,
 

 “By L. M. Pool, Pt.
 

 “State of Louisiana, Parish of Orleans.
 

 “Before me, the undersigned authority, personally came and appeared: L. M. Pool, who acknowledged unto me, Notary, that he signed the foregoing document of his own free will and deed.
 

 “L. M. Pool.
 

 “Sworn.to and subscribed before me this 31st day of December, 1927.
 

 “Nat. W. Bond, Notary Public.
 

 “O. K. F. D. G.”
 

 
 *315
 
 There has also been offered in'evidence a letter to the receiver from Mr. Pool, in his capacity as vice president of the Canal Bank, which reads as follows:
 

 “New Orleans, La. Dec. 27th, 1928.
 

 “Mr. A. I.
 
 f
 
 Picard, Receiver, Clover Ridge Pltg. & Mfg. Co. Inc., New Orleans, La.
 

 “Dear Sir: I have taken cognizance of a petition presented by you as Receiver to the 18th Judicial District Court of the Parish of Iberville, in the matter of the Receivership of Clover Ridge Pltg. & Mfg. Co., Inc., No. 272 of the docket of said court in which petition was filed on November 21st, 1928.
 

 ■ “We have also taken cognizance of the order of court by which you are authorized to issue receiver’s certificates aggregating $35,-000.00 to be subordinated in rank to the receiver’s certificates presently outstanding and issued under prior order of the court, aggregating $22,500.00. This order of court we note was executed on November 26th, 1927.
 

 “This is to confirm our advice to you that we, as a mortgage creditor of said Clover Ridge Pltg. & Mfg. Co., Inc., have consented to issuing certificates by you as Receiver aggregating $35,000.00, under the above mentioned order and petition and that we will take no action looking to a foreclosure of this mortgage prior to the 31st day of December, 1928.
 

 ' “We further agree that said certificates aggregating $35,000.00 shall be paid by preference and priority over our mortgage out of the assets of said corporation.
 

 “Tours truly,
 

 “Canal Bank & Trust Co.,
 

 “By L. M. Pool, Vice Presdt,
 

 “State of Louisiána, Parish of Orleans.
 

 “Before me, the undersigned Notary, personally came and appeared: L. M. Pool, who acknowledged unto me, Notary, that he signed the foregoing document of his own free will and deed.
 

 “L. M. Pool.
 

 “Signed by and subscribed before me this 28th day of December, 1928.
 

 “Nathaniel Diell, Notary Public.”
 

 It is settled in our jurisprudence, that a policy of insurance is a personal contract between the insurer and the insured, and is not a contract which in any. sense runs with the property; and-the proceeds of the policy in case of loss do not stand in lieu of the property. But the word “assets,” as used in the last paragraph of each of said letters, certainly could not be construed to have reference only to such assets as were in existence at the time when said letters were respectively written.
 

 The receivership was being operated as a going concern, in the hope of increasing the amount and value of its assets, and the word “assets” as used in said letters must have been intended to include any and all assets of the receivership, either then existing or to be acquired in the future.-
 

 Aside, however, from the express subordination of its mortgage rights as shown by said letters, I think the intimate knowledge which said banks had of the operations of the receivership, and their acquiescence in same, estopped the Canal Bank from asserting its claim (as a first mortgage creditor) to the proceeds of said insurance to the prejudice of those creditors who hold receiver’s certificates for money loaned to the receiver to operate the business of the corporation ; and I think said knowledge and acquiescence also estops the bank from assérting said claim to the prejudice of creditors
 
 *317
 
 whose claims are to be taxed as costs of the receivership, which, of course, includes claims for materials and supplies sold to the receiver to enable him to operate said business.
 

 In International Harvester Co. v. Union Irr. Co., 150 La. 405, 90 So. 741, 751, the Supreme Court said:
 

 “The vendor of movables is entitled to have the property upon which his privilege rests, seized and sold forthwith, and the proceeds distributed immediately by the receiver in a provisional account filed by said receiver, in which the proceeds of the sale only will be distributed. Hudson & Sons v. Uncle Sam Planting & Mfg. Co. et al., 136 La. 1071, 68 So. 129.
 

 “Instead of exercising this summary remedy, in which case it would have incurred the costs only of this particular sale and proceeding, the International Harvester Company permitted its property upon which it had a privilege to remain under the dominion, control, and operation of the receivership, taking the risk of such experiment, and therefore it subjected its property to the costs and charges of the receivership, the same as other creditors pursuing the same course. Teutonia Bank & Trust Co. v. Security Brewing Co., 137 La. 1046, 69 So. 833; Borne v. Alexander Hardwood Co., 140 La. 323, 72 So. 979.”
 

 In Borne v. Alexander Hardwood Co., 140 La. 315, 323, 72 So. 979, 982, the Supreme Court said:
 

 “Under these circumstances, we are of the opinion that the case is governed by the doctrine announced in Teutonia Bank & Trust Co. v. Security Brewing Co., 137 La. 1046, 69 So. 833, where it was held that those who had furnished to the receiver of the defendant corporation the supplies and materials necessary for the operation of the business of the corporation as a going concern were entitled to be paid out of the proceeds of the sale of the property of the corporation in preference to the claim of a mortgage creditor, who, having the right to foreclose his mortgage at will, had acquiesced in the appointment of the receiver with authority to conduct the business of the corporation as a going concern, and had awaited the result of that experiment, of which, if it had been successful, the mortgage creditor would have received the benefit.”
 

 If I remember correctly, it was argued in the case at bar that the decision in Teutonia Bank & Trust Co. v. Security Brewing Co., 137 La. 1046, 69 So. 833, is not applicable to the instant ease, for the reason that the corporation against which estoppel has been pleaded in that case- had actually petitioned for and secured the appointment of a receiver. This is true as to the plaintiff in that ease, but a careful reading of the decision reveals the fact that the plea of estoppel was also pleaded and sustained against other mortgage creditors who took no part in provoking the appointment of the receiver.
 

 Turning now to those items of the account which I think call for special comment, I am satisfied that the law charges of Guion & Upton, attorneys for the receiver, as set out in items 9 and 10, and the compensation of A. I. Picard, receiver, as set out in items II and 12, are reasonable and should be allowed.
 

 Items 15 (a) and (b) are shown by the evidence to represent an indebtedness due
 
 *319
 
 to Geismar & Heymann, Inc., in payment of receiver’s certificates issued to that corporation for money borrowed by the receiver, and should be approved.
 

 In view, however-, of the testimony of the receiver as shown in transcript of evidence, page 30, to the effect that the proceeds of these certificates are, in fact, payable to Canal Bank & Trust Company as pledgee of said’certificates, I think these items should be so amended as to show that fact.
 

 The evidence relative to item 15 '(e) presents an unusual situation.
 

 This item purports to represent an indebtedness due to Chalmette Petroleum Corporation in payment of receiver’s certificates held by that corporation. The evidence shows, however, that these certificates are not actually owned by this creditor, but were pledged by the receiver as collateral to secure the payment for fuel oil sold to the receiver to be used in operating the sugar factory of the Clover Ridge Company. Transcript of evidence, pages 35 and 79 et sec[.
 

 The record shows that on the day of the trial of this case at the commencement of the trial, the Chalmette Petroleum Corporation, through its attorneys, filed a petition in which it’referred to the fact that “appearer” is set down on the receiver’s account as a preferred creditor entitled to payment by preference out of the funds to be distributed as the holders of receiver’s certificates; and appearer averred “alternatively” that the consideration of the indebtedness of the receiver to appearer is the sale to the receiver of fuel oil necessary for the operation of the property of the receivership as a going concern, etc., and appearer averred that the indebtedness of the receivership to appearer is accordingly “alternatively” secured by the privilege accorded by law for the payment of necessary expenses of the administration, ranking as law charges and payable as costs of court; and, accordingly, appearer prayed:
 

 “That the provisional account of the receiver be homologated and approved in so far as it provides for the payment of the claim of appearer in full, by preference, upon the grounds set forth in said accouht; or, alternatively upon the grounds set forth in this opposition, and for costs and general relief.”
 

 As will be seen from page 4, Transcript of Evidence, counsel for Canal Bank & Trust Company opposed the filing of this opposition on the ground that it came too late. “And for the further reason that having accepted receivership certificates in lieu or in payment of the claim now asserted in this opposition, this opponent is now estopped to assert the claim set forth in this opposition,” etc.
 

 The court referred this objection and plea of estoppel to the merits and will overrule same.
 

 It has been held that opposition to an account may be filed even after the accountant has introduced his evidence in support of his application for homologation of same. See Succession of Scott, 41 La. Ann. 668, 6 So. 792.
 

 I am satisfied that under the provisions of section 5 of Act No. 159 of 1898, as amended by Act No. 199 of 1914, and as amended later by Act No. 7 of 1926, receiver’s certificates cannot be pledged to secure a running
 
 *321
 
 account for materials and supplies sold and to be sold to the receiver.
 

 As to the plea of estoppel urged to the filing of this “alternative opposition,” it should be borne in mind that such pleas are not favored in law, and can be of no avail to the party urging same unless he has been misled to his detriment or injury by the actions, or conduct of the party against whom the plea is urged; and the record fails to show any such act or conduct on the part of the Chalmette Petroleum Corporation.
 

 I think, therefore, that said corporation was properly allowed to prove up its claim on open account.
 

 It appears from the testimony of Mr. Bat-son, and from the exhibits marked respectively Chalmette 6, Chalmette 7, Chalmette 8, and Chalmette 9, that the claim of the Chalmette Petroleum Corporation consists of the following:
 

 First. A note dated July 15, 1929, for $1,-759.49, with interest at 7 per cent, from its date, and 10 per cent, additional as attorney’s fees; the principal of which note appears to represent a balance of $1,660.83 due on April 30, 1928, for oil previously sold to the receiver, plus interest on this amount at 5 per cent, per annum from April 30,1928, to date of the note, July 15, 1929.
 

 Second. The sum of $3,149.53 being an amount due for oil sold to the receiver from December 17, 1929, to January 14, 1930.
 

 Third. $493.25, being the cost of removing a storage tank as per contract offered in evidence.
 

 The aggregate amount of these items plus interest and attorney’s fees on the note would exceed the amount which the receiver has proposed to pay to the Chalmette Petroleum Corporation as the holders of receiver’s certificates. The Chalmette Company, however, has not objected to the amount which the receiver proposes to pay, nor suggested that same be increased, but, on the contrary, has prayed for the homologation of the account as we have already seen; and I think the court should therefore direct that item 15 (c) be amended only to the extent that it show that the amount to he paid to the Chalmette Company, as set out in said item, is to be paid in full settlement of the indebtedness due to the Chalmette Company, as shown by the evidence.
 

 Items 16 (a) and (b) and item 17 (b) showing amounts payable to Canal Bank & Trust Company as holders of receiver’s certificates appear to be correct as to amounts and will be approved. See transcript of evidence, pages 31, 32, and 33.
 

 It appears, however, that the date of the certificates mentioned in item 16 (b) is May 3, 1927, instead of July 5, 1927, and July 16, 1927, as shown in the account. Transcript of evidence, pages 32 and 33.
 

 To keep the record straight, the necessary amendments of this item will be made.
 

 Item 17 (a) showing amount due Federal Intermediate Credit Bank, as holder of receiver’s certificates, appears f;o be correct and will be approved. Transcript of evidence, page 50 et seep
 

 Item 17 (e) purporting to show an indebtedness due to Penick & Ford, Limited, as holder of two receiver’s certificates, should be so amended as to show that said creditor is
 
 *323
 
 entitled to be paid the amount of five certificates, four of same for $1,000 and one for $700. The certificate for $700 being dated May 9, 1929, two of the certificates for $1,000 each, being dated April 9, 1929, and two being dated May 9, 1929, all bearing interest at 7 per cent, per annum from their respective dates. Transcript of evidence, pages 3, 50 et seq., and 113.
 

 Item 17 (d) purports to show an amount due and payable to State Agricultural Credit Corporation, secured by twenty-three receiver’s certificates of $1,000 each.
 

 ,I think this item should be stricken from the account for the reason that said indebtedness is not one of the receivership, but is the aggregate amount of debts due and owing to said corporation 'by tenants on the Clover Ridge plantation, which debts are represented by promissory notes of said tenants, payable to the order of said corporation. '
 

 The receiver undertook to pledge said certificates- as collateral security to said notes, but I think he was without authority to do so.
 

 These certificates were part of a series of $35,000 of certificates authorized to be issued by1 an order of court November 21, 1928, and the learned counsel for State Agricultural Credit Corporation lay much stress upon the fact that said order of court contains a clause which reads as-follows:
 

 “The balance of said certificates to be issued for the purpose of carrying on, planting and cultivating and producing crops upon the property of said corporation, under lease and otherwise, and in the proper maintenance of the same as the same may be needed.”
 

 The petition of the receiver in compliance with which said order was granted contained allegations which read as follows:
 

 “That the said Lower Trinity Plantation, belonging to Theo. Donaldson, and which is contiguous to the property of said Clover Ridge Planting & Manufacturing Co. Inc., was and is being cultivated by your petitioner under a lease from the said Theo. Donaldson for the year 1928, and that in order to properly conduct the affairs of said corporation your petitioner desires to renew said lease for the year 1929 for a consideration of two thousand seven hundred ($2,700.00) dollars, payable in advance, payments to be made by your petitioner issuing to the said Theo Donaldson three receiver’s certificates, two for the sum of one thousand ($1000) dollars each, and one for the sum of seven hundred ($700.00) dollars, the same to be payable on or before December 31st, 1928, and conditioned to bear interest at the rate of seven per cent. (7%) per annum from their date of issuance until paid, such consideration being the same consideration paid to said Donaldson for the rent of said property for the present year 1928.”
 

 “That petitioner considers it to the best interest and advantage of the creditors of said corporation, and to all parties in interest, that said lease be entered into and renewed and said property be cultivated another year and he recommends and advises the renewal of same.”
 

 The prayer of the petition includes a clause in which the receiver sought authority to deliver $2,700 of said certificates to Theo. Donaldson, for a renewal of the lease, and the
 
 *325
 
 order of court complied with this as with other parts of petitioner’s prayer.
 

 I think it is clear that the words “under lease and otherwise,” as used in the order, are intended only to refer to the cultivation, etc., of lands leased by the receiver from Donaldson, and not lands leased by the receiver to tenants.
 

 The evidence and particularly the stipulation of facts marked “Woodward 1” shows that the receiver owes Woodward, Wight & Co. a balance of $395.70 for necessary supplies sold to the receiver, on which amount legal interest is due from March 22, 1928. This item was inadvertently omitted from the account and should be included therein as a privileged debt to be paid by preference out of the funds to be distributed.
 

 Item 18 properly shows that Canal Bank & Trust Company is entitled to be paid the balance left after payment of creditors who are entitled to be paid by preference out of the funds to be distributed, and to this item there should be added any additional balance that may be left as a result of the elimination of the claim of State Agricultural Credit Corporation.
 

 The court will overrule the pleas that the mortgage notes held by Canal Bank & Trust Company are barred by the prescription of five years. I think the indorsements on said notes clearly' show that they are not prescribed.
 

 The exception of no right or cause of action urged against the demands of Canal Bank
 
 &
 
 Trust Company which by agreement of counsel was referred to the merits is also overruled.
 

 As will be seen from the last page of the transcript of evidence, it was agreed by all counsel in this case that the charges for taking the stenographic notes in connection with this trial and filing of the transcript of evidence in the district court should be paid for out of funds in the possession of the receiver, and taxed as costs of these proceedings.
 

 I think that any additional costs incurred herein should also be paid out of the funds in the hands of the receiver.
 

 Subject to the amendments set forth in this opinion, the provisional account of the receiver will be homologated and approved.
 

 Judgment will be written up and signed in accordance with the foregoing opinion and reasons for judgment.
 

 Supplemental Opinion.
 

 The original outline of reasons for judgment having been filed, but no judgment having yet been signed and filed, it has been suggested to the court by counsel for Canal Bank & Trust Company that the court should have made some disposition in the original opinion of the alternative claim of the said bank for reimbursement of insurance premiums paid by it amounting to $1,705.
 

 Probably I should have said something in the original opinion with reference to this claim, but when I prepared the opinion my recollection is very distinct that, although in the original brief of counsel for Canal Bank & Trust Company this claim was urged in the alternative, nevertheless it was not urged or mentioned in the bank’s opposition to the provisional account of the receiver.
 

 
 *327
 
 Since receiving the letter from counsel in reference to this matter, copies of which were mailed by counsel to hll other counsel herein, I have again carefully examined the record, and particularly the opposition to the receiver’s account filed by Oanal Bank & Trust Company, and I find that my original impression was correct. No alternative plea for reimbursement for the premiums above mentioned was set up in the opposition Of the Canal Bank & Trust Company, and no reference therein was made to same. This claim, therefore, was not made an issue in the case, and I do not think the court would have authority to direct that the account be amended as suggested in counsel’s brief.
 

 Moreover, I doubt very gravely, whether the Claim should have been recognized even if it had been made an issue.
 

 The bank has profited greatly as a result of the insurance for which these premiums were paid. Out of the insurance money the bank will be paid the amount of receiver’s certificates set down in the account as items 15 (a) and (b) as belonging to Geismar and Heymann.
 

 The bank will be paid the certificates mentioned in items 16 (a) and (b) and will be paid the balance of the proceeds mentioned in item 18 plus an additional amount that will be left as a result of the elimination from the account of the claim of State Agricultural Corporation.
 

 Moreover, it appears to me that the question of the recognition vel non of the claim is an academic rather than a practical one, for the reason that if the bank should be set down on the account as a preferred creditor to the extent of the premiums referred to, the effect would be to reduce pro tanto the balance that the bank would receive under item 18; and the remaining assets of the receivership yet to be distributed in the final account yet to be filed cannot possibly be sufficient to pay the balance that will be due to the bank as holder of first mortgage notes.
 

 I.
 

 We think the trial judge correctly appreciated the proper manner of distributing the proceeds of the insurance policies.
 

 The policies were payable to the receiver and contained the following loss payable clause, to wit: “Any loss proven to be due the assured under this policy is held payable to Holder or Holders of First Mortgage Notes, as their interest may appear, subject, however, to all the conditions of this policy; balance, if any, payable to the assured” Such was the undertaking of the insurance company, and it is immaterial who paid the premiums or with what purpose in mind.
 

 But a policy of insurance is a contract of indemnity, and not a wager, hence it cannot cover more than the insurable interest of the person assured in the thing insured. Thus a creditor taking out insurance on the life of his debtor must prove the amount of his debt at the death of the assured and -can receive no more, but must account for the overplus to the estate of the assured. Crotty v. Union Mutual Life Ins. Co., 144 U. S. 621, 12 S. Ct. 749, 36 L. Ed. 566. Thus, also, under a fire insurance policy taken out by the owner with a clause providing that loss if any would be payable “as interest may appear” to the assured and to the mortgage
 
 *329
 
 holder, it was held that the mortgage holder’s interest was only the balance which might be due him at the time the loss occurred. Officer v. American Eagle Fire Ins. Co., 175 La. 581, 143 So. 500. This is just and reasonable; otherwise the creditor would not merely be indemnified for his loss, which is the purpose of insurance, but would be actually enriched by the happening of an event, and a contract of insurance would be not one for indemnity but a pure and simple wager. Thus, for instance, if the holder of a second mortgage upon property already incumbered to its full value by prior mortgages and liens were to take out for his own account insurance on the mortgaged property to the amount of his mortgage, and were to recover under the policy the full amount of his claim, this would not be indemnifying him for his loss, since he had no real interest in the mortgaged property, but enriching him to the extent of his worthless mortgage by reason .of the happening of the fire. And this would be a mere wager between him and the insurer as to whether such a fire would occur.
 

 In this case the Canal Bank originally had under.its mortgage an interest in the mortgaged property equal to the full amount of its mortgage, but by voluntarily subordinating its mortgage to various receivership certificates herein issued and to the receivership charges by voluntarily acquiescing in the receivership, its interest in the property in the hands of the receiver was gradually diminished as the amount of these receiver’s certificates and receiver’s charges grew, so that when the receivership came to the end, to which all receiverships seem inevitably doomed, the interest of the Canal Bank in the property of the receivership was nothing more than to receive out of such property the residuum, if any, which might remain after the payment of the receiver’s certificates and the receiver’s charges.
 

 It was therefore this residuum, if any, and not the amount of its mortgage debt, which was the measure of the interest assurable to the Canal Bank and its predecessor the Marine Bank “as their interest may appear, *
 
 * *
 
 balance, if any, payable to the assured (the receiver).” As the trial judge has distributed the proceeds of the insurance policies in exact accord with these views, we find his judgment correct on that point.
 

 II.
 

 We think the trial judge erred in striking from the account the claim of State Agricultural Credit Corporation.
 

 The receiver had obtained from the beginning authority to operate the property as a going concern.
 

 The property consisted of agricultural lands partly belonging to the Clover Bidge Planting & Manufacturing Company and partly leased from adjoining landowners. The receiver thought it best to cultivate the lands, or a part of them anyhow, under the tenant-farmer crop-sharing system, and the tenant-farmers could not cultivate the land without advances being made to them during the planting and growing seasons, all of which was known to the Canal Bank.
 

 For a time the receiver made these advances himself out of receivership funds, but eventually had to apply for assistance to the State Agricultural Credit Corporation, which agreed to make the advances on crop liens given by
 
 *331
 
 the tenant-farmers and further secured by pledge of receiver’s certificates; said certificates to prime the claims of the mortgage holders (Canal and Marine Banks). And, accordingly, on November 26, 1927, the* receiver obtained an order of court authorizing him to issue certificates ($25,700) “payable on or before December 31st, 1928, and to pledge [$20,000 of] said certificates of indebtedness to State Agricultural Credit Corporation, Inc., as security for the payment of advances to be made by said State Agricultural Credit Corporation, Inc., to tenants of the Lower, Upper and Middle Trinity Plantations, and of the property of Clover Ridge Planting & Manufacturing Co., Inc.”
 

 On December 31,1927, the Canal Bank took cognizance of the aforesaid order of court authorizing the issuance of said receiver’s certificates and agreed “that said certificates aggregating $25,700 shall be paid by preference and priority over our mortgage, out of the assets of said corporation.” These particular receiver’s certificates are not involved in this controversy, but mention is made of them to show that the Canal Bank was well aware of the purpose of the receiver in issuing said certificates, to wit, that the receiver was cultivating said property by means of tenant-farmers to whom State Agricultural Credit Corporation, Inc., was making advances for the receiver, which advances the receiver was securing by pledging the certificates issued by him; in other words, that the receiver instead of borrowing the cash money on certificates from the State Agricultural Credit Corporation, or some other institution or person, and therewith making advances directly to the tenant-farmers, had arranged with the State Agricultural Credit Corporation, Inc., to have said advances made by the association directly to said tenant-farmers and to secure said advances by the pledged certificates.
 

 On November 21, 1928, the receiver applied for and obtained an order authorizing him to issue another $35,000 of receiver’s certificates to be used partly to pay the rent of one of the plantations leased by the receiver, partly to take up such already outstanding receiver’s certificates as had not been paid out of the proceeds of the year’s crops, and “the balance of said certificates to be issued for the purpose of carrying on, planting, cultivating and producing crops upon the property of said corporation, under lease or otherwise, and in the proper maintenance of the same, as the same may be needed.” Of this order the Canal Bank took cognizance on December 7, 1928, and agreed “that said certificates aggregating $35,000 shall be paid by preference and priority over our mortgage out of the assets of said corporation.” These are the certificates involved here.
 

 As we said before, the Canal Bank knew quite well how the receiver was “carrying on, planting, cultivating and producing crops upon the property of said corporation, under lease or otherwise,” and by what means the receiver was obtaining the funds to do so; so that, unless everybody (said everybody being those interested or concerned in the receivership, to wit, the receiver, the Canal Bank, the State Agricultural Credit Corporation, and the trial judge) assumed, because of the mere change in the form of the last order, that the receiver in this informal way meant to effect a radical change in his previ
 
 *333
 
 ous method of “carrying on, planting, cultivating and producing crops upon the property of said corporation, under lease or otherwise,” then the order of November 21, 1928, meant to all of them exactly the same as the order of November 26, 1927, even though the later order did not detail the whole modus operandi as the former order had done; and without such far-fetched assumption the order of November 21, 1928, would be quite meaningless and wholly abortive as to its clearly declared purpose to provide for the “carrying on, planting, cultivating and producing crops upon the property of said corporation under lease or otherwise.”
 

 We are therefore of opinion that the Canal Bank, when it consented to the issuance of the certificates authorized by the order of November 21, 1928, and consented that said certificates should prime its mortgage, also consented that said certificates should be used for the same purpose and in the same way that the certificates issued under the order of November 26, 1927, had been used by the receiver with its consent.
 

 We do not think that the fact that the receiver pledged the certificates to obtain advances for his tenant-farmers, instead of selling the certificates outright and making the advance himself, wholly invalidates the certificates so pledged. The receiver of a corporation may in order to carry on the business of the corporation be authorized by the judge to “borrow or obtain money on certificates of indebtedness to be taxed as costs of court.” Now, whether the receiver sells a certificate and takes the whole amount thereof at once or pledges the certificate for an open credit and takes out the amount in lesser sums from time to time, in either case he is borrowing or obtaining money on such certificates, with this difference only, that in the latter case he is borrowing or obtaining the money only as he needs it and paying interest on only so much as he thus borrows or obtains instead of on the whole amount of the certificates. This is surely not contrary either to the letter or to' the spirit of the statute. Act No. 7 of 1926.
 

 Of course the certificates so pledged bind receiver and the property in his charge only to the extent that funds have come into his hands ór into the hands of his appointees to receive them, in this case the tenant-farmers of the receiver. Here the State Agricultural Credit Corporation, holder of the pledged certificates, are claiming only the exact amount of their advances to the tenant-farmers, and no more; to that extent we think the certificates valid.
 

 III.
 

 All the other issues in the case have been correctly disposed of by the trial judge, and we see nothing that may be added to his opinion.
 

 Decree.
 

 For the reasons assigned, the judgment of the court below is amended by reinstating the claim of the State Agricultural Credit Corporation; and, as thus amended, the judgment appealed from is affirmed; costs of appeal to be paid by the Canal Bank & Trust Company.
 

 O’NIELL, O. J., is of the opinion that the judgment appealed from should be affirmed without any amendment.