414 So.2d 1313 (1982)
TRICO SERVICES CORPORATION, et al., Plaintiffs-Appellants,
v.
HOUSTON GENERAL INSURANCE CO., Defendant-Appellee.
No. 14805.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1982.
Rehearing Denied May 12, 1982.
*1315 Durrett, Hardin, Hunter, Dameron & Fritchie by Roger M. Fritchie, Baton Rouge, for plaintiffs-appellants.
Cook, Clark, Egan, Yancey & King by Benjamin C. King, Shreveport, for defendant-appellee.
Before HALL, JASPER E. JONES and NORRIS, JJ.
JASPER E. JONES, Judge.
This is an action on a fire and extended coverage insurance policy. The plaintiffs sued to recover amounts in excess of those previously paid by the defendant and for penalties and attorney's fees. The plaintiffs appeal the judgment of the district court seeking an increase in the amount awarded under the policy and penalties and attorney's fees which were denied by the trial judge. The defendant answered the appeal seeking to have the amount of the judgment reduced.
The plaintiffs are Trico Services Corporation, owner of the insured property; The Reliable Life Insurance Company, mortgagee of the insured property; and Equity Management Corporation, manager of the insured property. The defendant is Houston General Insurance Company.
The facts of the case are set out below.
The insured property was the "Security U Stor & Lock" mini-warehouse complex located in Bossier City, Louisiana. The complex was composed of a building containing an office and living quarters for the resident manager (we will refer to this building as the "office"), nine warehouse buildings denominated "A" through "I" and one warehouse building denominated as "Phase II, or J" (hereinafter referred to as "J"). The buildings were constructed of hadite concrete blocks.
The complex was managed by Equity for a percentage of the rentals. It was operated as a self-service mini-warehouse complex. The warehouse units were rented without locks which were supplied by the renters. Because the renters supplied their own locks, Equity could not open the units.
The record shows that the business was very successful. In December 1978, 99.5% of the 709 units were occupied. Expansion was planned and a metal building to be erected as Phase III was on order.
Equity obtained fire and extended coverage insurance on the complex from defendant. The policy had limits of $1,066,000 on the buildings and other improvements, $5,000 on the contents of the office and $129,600 on lost rentals. The policy insured against damage due to windstorms. The policy was a blanket-type policy in that it provided the total amount of coverage on eleven separate buildings.
On December 3, 1978, a tornado struck the complex doing extensive damage. Buildings A, B, C, D and I and the office were destroyed, or so heavily damaged that they had to be razed. The other buildings were damaged, but repairable.
The tornado left the complex in chaos. Photographs in evidence show the site was strewn with debris, much of it the contents of the damaged units. The damage made whatever remained in many of the units subject to theft.
To protect the persons trying to remove their belongings from the site and to begin and speed repairs, Equity quickly acted to *1316 have the debris removed from the site. This was accomplished by the use of heavy equipment which pushed the debris off the site.
On December 15, 1978, Houston General made an advance payment of $50,000 to plaintiffs.
A few days after the storm the metal building that was to be used as Phase III was delivered. The plaintiffs had the building erected as quickly as possible and tried to encourage persons moving their property out of the damaged units to move into units in the new buildings.
In an effort to get back into operation quickly, plaintiffs had buildings A, B and I replaced with metal rather than concrete block buildings. The other buildings were rebuilt or repaired with concrete blocks. When the office was rebuilt the original one-story structure was replaced with a two-story building.
Following the storm plaintiffs obtained bids from several contractors for the repair of the complex. Houston General refused to accept these bids because they were insufficiently detailed to allow verification.
Houston General had J. O. Lochridge General Contractors, Inc. prepare a bid for restoration of the complex. On March 19, 1979, Lockridge submitted a bid of $494,945. This was later increased to $504,900. Lockridge is based in Dallas, Texas and was not authorized to do business in Louisiana at the time it submitted its bid.
Equity had the Lochridge bid reviewed by Coyle Engineering Company and Robert E. Jones & Associates. After review, neither Charles Coyle, P.E., nor Robert Jones, P.E., found the bid adequate. However, the Florsheim Construction Company of Shreveport agreed to perform the work in the Lochridge bid for the specified price. When approached by Equity, Florsheim refused to contract to restore the complex to its pre-storm status for the price in the Lochridge bid. Florsheim later submitted a bid of $775,000 to restore the complex to its pre-storm status.
On March 22, 1979, Equity submitted a proof of loss of $833,762 excluding lost rentals. After Houston General had refused to accept the earlier bids they had obtained, plaintiffs contacted the Whitaker Construction Company and asked it to prepare a bid. In April, Whitaker submitted a bid of $706,088.
On May 18, 1979, Houston General responded to the proof of loss with a tender of $578,017.40. The letter enclosing this draft itemized the loss as follows:

Buildings $504,900.00
Emergency Repairs, Clean up and
 Debris Removal 18,722.45
Contents of Office 4,978.00
Actual and Projected Rent Loss 87,899.72
Expenses to Reduce Rent Loss 12,517.23
 ___________
Total Losses and Damage $629,017.40
Less Deductible 1,000.00
Less Advance 50,000.00
 ___________
 AMOUNT TENDERED $578,017.40

The plaintiffs contend that additional amounts were due based on the amount of the Whitaker bid and Florsheim's refusal to guarantee to fully restore the property for Lochridge's price. Despite those facts Houston General refused to make any further payments after which plaintiffs brought this action.
After a trial on the merits the district court found the amount owed under the policy to be $690,060.70, against which the court offset the $50,000 advance, the May 18th payment of $578,017.40, the $1,000 deductible and salvage of $1,100, and rendered judgment for the balance of $59,943.30, with interest from date of judgment. The excellent reasons for judgment prepared by the trial judge sets forth the manner in which he arrived at the amount of his award as follows:

"CREDITS
The following credits are due defendant herein:

Advance payment $ 50,000.00
May 18, 1979 payment 578,017.40
Deductible 1,000.00
From funds received from sale
 of salvaged blocks (Tr. p238) 1,100.00
 ___________
 $630,117.40

*1317 For the reasons set forth above it is the opinion of the court that the plaintiffs should have judgment against the defendant Houston General Insurance Company as follows:

A, B & I $176,361.00
C, D & J 187,097.00
E, F, G & H 107,037.25
Manager's office 34,263.00
Asphalt 27,500.00
Fencing 3,383.00
Landscaping 1,119.00
Office Furniture & Fixtures 4,978.00
Clean-up 18,722.45
Rentals 129,600.00
 ___________
 $690,060.70

Subject to a credit of $630,117.40, leaving a net amount due of $59,943.30, and all costs herein."
By the time of trial in June 1980, the appellants had substantially restored the complex by using their own employees and the services of various contracting firms. None of the work was performed by Lochridge, Whitaker or Florsheim who had bid the job.
The trial court determined the amount that appellants were entitled to based upon the amount which was actually expended by them in replacing buildings A, B, C, D, I and the west 115 ft. of J. There was no reliable evidence in the record as to what appellant spent on the repair of buildings E, F, G and H, and for this reason the trial court determined the amount of the appellants' loss on those buildings to be the amount which Whitaker had bid to repair them. Because appellants replaced the one-story office building, which was destroyed by the storm, with a larger two-story building, the trial judge used the amount bid by Whitaker to replace the original office structure as the amount to which appellants were entitled to for destruction of the office building. The trial judge based the award for fencing, landscaping and clean-up on the amount which appellants' records established were actually expended by them in connection with these activities. Because appellants replaced much of the damaged asphalt with more expensive concrete and because some of the asphalt had been damaged before the storm in connection with the installation of a drainage system, the trial court made the asphalt award based upon the Whitaker bid for replacement of the asphalt, reduced by the cost of replacing the asphalt which had been damaged before the storm.
We amend the judgment to change the time at which legal interest commences to run, and, otherwise, affirm the judgment.
On appeal the appellants urge seven assignments of error. Appellants contend:
1) that the trial judge erred in applying the replacement cost endorsement of the policy to determine appellants' loss;
2) alternatively, they contend that the trial court erred in its interpretation of the replacement cost endorsement to the policy;
3) that the trial judge erred by incorrectly applying the total cost provisions regarding evaluation of losses (appellants contend here they are entitled to the total amount of the Whitaker bid for replacing the complex rather than the actual cost of replacing each item damaged or destroyed);
4) that the trial judge erred in basing the amount of recovery on expenditures for replacement of property unrelated to the value of the damaged property (appellants here contend that the trial judge erred in awarding the actual cost of replacing destroyed concrete block buildings with metal buildings);
5) that the trial judge erred in awarding interest only from the date of judgment;
6) that the trial judge erred in failing to award penalties and attorney's fees; and
7) that the trial judge should have found the deductible to have been only $500.
In its answer to the appeal defendant urges five assignments of error. The defendant suggests that the district court erred:
1) by granting judgment in favor of Trico as it was not named an insured on the face of the policy;
2) in granting judgment in favor of Reliable as it was not a designated loss payee on the face of the policy, and there is no proof of the amount of its mortgage;
*1318 3) in granting judgment in Equity's favor for more than its insurable interest;
4) in awarding additional sums when the amount paid were sufficient to fully restore the property; and
5) alternatively, in awarding excessive amounts for paving and lost rent.
We begin by considering defendant's first three contentions.
The form of the judgment was as follows:
"IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiffs, Trico Services Corporation, Equity Management Corporation and The Reliable Life Insurance Company, and against the defendant, Houston General Insurance Company, for the sum of $59,943.30 together with legal interest thereon from date of judgment until paid."
Equity was the only named insured on the policy. Houston General argues that it was error to grant judgment in favor of Trico because it was not an insured, and Reliable because it was not a loss payee and did not prove the amount of its mortgage.
Houston General contends that an insurance policy is a personal contract between the insurer and the named insured and does not cover any portion of the loss beyond the interest of the named insured shown on the face of the policy. To support that proposition appellee cites Union Central Life Ins. Co. v. Harp, 203 La. 806, 14 So.2d 643 (1943) and In Re: Clover Ridge Planting & Mfg. Co., 178 La. 302, 151 So. 212 (1933). Those cases, however, do not stand for the defendant suggested rule.
Harp merely says that a fire policy does not pass with insured property which is sold. Clover says only that insurance "is a personal contract between the insurer and insured" which does not run with the property. (151 So. p. 216). Neither case holds that a policy is personal between the insurer and the named insured and for that reason covers only the interest of the party designated as the named insured on the face of the policy at the time it was issued.
The defendant also relies on Eagle Star Ins. Co., Ltd. v. General A. F. & L. A. Corp., 315 So.2d 826 (La.App. 3d Cir. 1975). Eagle Star has no application to this case. There the court held that the purchaser of an airplane could not recover on a policy issued to his vendor. No sale of the insured property is involved in this case and defendant's reliance on Eagle Star is misplaced.
Duncan v. Sun Mut. Ins. Co., 12 La. Ann. 486 (La.1857), sets out the test to determine whether or not Trico and Reliable are protected by the policy. That case states that when a general survey of the policy and circumstances under which it was procured show that it was the intention of the company and the named insured to protect any party in interest, then that party, even though un-named, may recover on the policy. Duncan, supra.
The evidence shows Equity intended to insure and protect the interest of Trico and Reliable as well as its own. David Watkins, Jr., an executive vice president of Equity, so testified. This is also shown by the policy purchased. Equity's only interest was in the rents themselves, but, they purchased a policy which insured not only the rents but the complex and office contents as well. The latter items were ones in which only Trico and Reliable had interests. The policy contains an endorsement effective November 1, 1978 which states "Mortgagee-The Reliable Life Ins. Co., c/o Trico Services Corp." The defendant paid the $578,017.40 on May 18, 1979 by draft payable to Trico, Equity and Reliable. We conclude that all of these circumstances establish an intent of the insurer and the Equity Management Corporation to include in this policy the interest of Reliable and Trico as insureds under the policy.
Trico and Reliable can both recover on the policy in addition to the named insured, Equity. Duncan, supra; Nielsen v. Lafayette Insurance Company, 300 So.2d 217 (La.App. 2d Cir. 1974); Diaz v. Cherokee Insurance Company, 275 So.2d 922 (La.App. 4th Cir. 1973).
That Trico, the owner of the insured property, may recover on the policy renders harmless any error in granting judgment *1319 for more than Equity's insurable interest or in Reliable's favor absent proof of the amount of its mortgage. This is true because Trico will be entitled to any part of the judgment which is not attributable to the smaller interests of Equity and Reliable. Neither Trico, Equity nor Reliable complain about the manner in which the judgment was rendered.
These contentions by defendant are without merit.
PLAINTIFFS' ASSIGNMENT # 1
Through this assignment appellants contend that the trial court erred in applying the replacement cost endorsement of the policy.[1] The replacement cost endorsement provides the insured is to recover the lesser of:
a) the policy limits
b) the replacement cost of the property or any part thereof with identical property
c) the amount actually and necessarily expended in repairing or replacing the property.
The replacement cost endorsement also provides:
"[t]he insured may elect to make claim under this policy in accordance with its provisions, disregarding this endorsement...."
The plaintiffs desired to have the basic policy provisions, which provide for recovery on actual cash value, applied. They were entitled to have their losses assessed under the basic policy provisions under the language of the policy. LSA-C.C. art. 1901.[2] The trial court in its reasons for judgment clearly stated that it was applying the provisions of the replacement cost endorsement to determine the amount which appellants were entitled to recover under the policy. The trial court should have made this determination under the actual cash value provisions of the policy. Actual cash value is the amount required to repair or replace the damaged or destroyed property to or in its original condition. Gibsland Supply Co. v. American Employers Ins. Co., 242 So.2d 310 (La.App. 2d Cir. 1970); Holloway v. Liberty Mutual Fire Insurance Co., 290 So.2d 791 (La.App. 1st Cir. 1974).
The thrust of appellants' contention here is directed at the trial judge's determination that because the appellants replaced buildings A, B and I with metal buildings the amount they were entitled to recover was determined by Section C of the replacement cost endorsement which provides that the insured is entitled to recover the amount actually expended in replacing the property. Appellants properly argue that because the replacement cost endorsement is inapplicable they are entitled to recover the actual cash value of the block buildings destroyed. They contend the actual cash value of A, B and I is the amount of the Whitaker bid to replace them with concrete block which exceeds by $105,254 the actual cost of replacing A, B and I with metal buildings. As will be hereinafter shown in our discussion of plaintiffs' assignment of error # 4, a determination of the loss based upon actual cash value would have resulted in a conclusion that the loss was substantially *1320 the same as determined by the trial court, and, therefore, the amount awarded for buildings A, B and I was correct.
Our resolution of Assignment # 1 makes it unnecessary to consider plaintiffs' alternative Assignment # 2.
PLAINTIFFS' ASSIGNMENT # 3
Through this assignment appellants contend that the trial court erred in applying the provisions of the replacement cost endorsement for the evaluation of losses to the individual buildings. The replacement cost endorsement provides:
"If the coverage on property under this policy be divided into two or more items, all of the foregoing shall apply separately to each item to which the endorsement applies."
As previously stated, the replacement cost endorsement was inapplicable and the trial judge's application of its provisions was in error. However, the evaluation of losses based upon damage to individual buildings was correct under the provisions of LSA-R.S. 22:695(B) which provides:
"B. Under any fire insurance policy, which may be written hereafter, and which is intended to take effect, at or after 12 o'clock noon, Central Standard Time, on the first day of August, 1964, on any inanimate property, immovable by nature or destination, situated within the State of Louisiana, the insurer shall pay to the insured, in case of partial damage, without criminal fault on the part of the insured or the insured's assigns, such amount, not exceeding the amount for which the property is insured, at the time of such partial damage, in the policy of such insurer, as will permit the insured to restore the damaged property to its original condition; provided, however, that for any loss of an insured object which would constitute total loss under Sub-section A of this provision but which loss is covered by a blanket-form policy of insurance, Sub-section B of this provision shall apply, and the insurer shall pay to the insured an amount equal to the actual cash value at the time of the loss of each insured object so destroyed, not exceeding the total amount of the insurance." (emphasis added)
The crux of appellants' contention is that they are entitled to the damages to the complex as reflected in the total amount of the Whitaker bid in the amount of $706,088, rather than the amount of the cost required to repair and replace each damaged or destroyed item of property added together. Appellants cite no authority for this contention and it is contrary to the intent expressed in the quoted provision of the valued policy law and the jurisprudential definition of actual cash value which provides they are entitled to the actual cost of repairing or replacing the damaged or destroyed property. Appellants have cited no case, and we found none, that holds that an insured is entitled to recover his loss based upon the total of some estimated amount by one contractor for which he will repair or replace all of the property covered by the blanket policy.
The trial judge's action was correct under § 695(B) because this statute provides that the loss on partially damaged buildings shall be the amount required to restore the building to its original condition and on totally destroyed buildings covered by a blanket policy, such as we have here, the loss shall be the actual cash value of each building destroyed.
PLAINTIFFS' ASSIGNMENT # 4
The appellants argue that the trial judge erred by using expenditures unrelated to the actual cash value of the property as a measure of recovery. The basis for this assignment is the award for the destroyed buildings A, B and I which was determined by the trial judge to be the cost of the metal buildings used to replace them.
Appellants are entitled to an amount sufficient to restore the property to its condition before the storm. LSA-R.S. 22:695(B); Gibsland; Holloway, supra.
Appellants contend that the cost of the metal buildings is not a proper basis of measurement of the cost of restoration because the metal buildings are inferior to block and did not restore the property to its pre-storm condition. Plaintiffs seek to recover *1321 for the amount Whitaker bid to restore A, B and I, which was the sum of $281,615.
We agree that the recovery should be based on the cost of restoring the destroyed buildings with block buildings. However, that cost is best shown by the cost of replacing buildings C, D and the west 115 ft. of J, rather than the Whitaker bid. These buildings, which had an area of 23,625 sq. ft. were rebuilt with concrete blocks at a cost of $187,097, or $7.92 per sq. ft.
The Whitaker bid to replace A, B and I, which had a total of 18,760 sq. ft., with concrete blocks was $281,615, or $15.01 per sq. ft., which is almost twice the actual cost of rebuilding C, D and the west 115 ft. of J. The trial judge awarded $176,361 for A, B and I. This is $9.40 per sq. ft. Though the award is somewhat higher than the actual cost on C, D and J, the difference is justified to allow for possible minor variations in the two groups of buildings which could result in a slightly higher cost in replacing buildings A, B and I with block than it cost to replace buildings C, D and the west 115 ft. of J with block. We conclude that the amount awarded by the trial judge for buildings A, B and I was adequate to have replaced them to their original condition of concrete block construction.
PLAINTIFFS' ASSIGNMENT # 5
The plaintiffs assign as error the trial judge's refusal to grant pre-judgment interest through assignment number five. Plaintiffs contend that interest should begin running sixty days after they submitted their proof of loss. We agree.
The policy provided that amounts due under the policy are payable sixty days after the proof of loss. Debts bear interest from the time they are due. LSA-C.C. art. 1938.[3] The debt in this case was due sixty days after the proof of loss, and, therefore, interest would commence to run sixty days after proof of loss. Isadore v. Washington Fire and Marine Insurance Co., 75 So.2d 247 (La.App.Orl.1954); Haynes v. Standard Fire Ins. Co., 370 So.2d 118 (La.App. 1st Cir. 1979). The proof of loss was submitted on March 22, 1979; therefore, interest should have commenced to run on May 22, 1979. However, in this case the award made by the trial court included $29,183.05 for loss of rent that was not included in the funds paid by defendant to appellants on May 18, 1979. The funds tendered on this date included projected rent loss through August 1979. The additional rent loss awarded by the court was not actually totally sustained by the appellants until November 1979. For this reason we award interest on the $29,183.05 commencing January 1, 1980, sixty days after the loss of this rent was actually sustained, and at which time appellee should have paid it; and interest on the remaining part of the judgment which is the sum of $30,760.25 shall commence on May 22, 1979.
PLAINTIFFS' ASSIGNMENT # 6
Plaintiffs' sixth assignment of error addressed the trial judge's failure to find defendant's refusal to pay additional amounts arbitrary and capricious.
Plaintiffs concede that defendant's payment based on the Lochridge bid on May 18, 1979 was reasonable at the time made. They contend, however, that defendant's subsequent failure to pay additional amounts after it was given the Whitaker bid and Florsheim repudiated the Lochridge bid, was unreasonable.
The record shows that the trial judge allowed $560,460.70 for damages to the complex and $129,600 for loss of rent. Thus, the Lochridge bid of $504,900 was approximately $55,000 off the amount allowed, while the Whitaker bid of $706,088, which plaintiffs contend impeached the Lochridge bid, was off by approximately $146,000, or nearly three times as much as the Lochridge bid.
An insured may recover penalties and attorney's fees on the difference in the amount tendered and the amount due when the failure to tender the full amount is arbitrary and capricious. Haynes v. Standard, supra. An insurer's misinterpretation *1322 of its policy is not a reasonable grounds for delay in payment and will not avoid liability for penalties and attorney's fees. Carney v. American Fire & Indem. Co., 371 So.2d 815 (La.1979). Where a plaintiff inflates his claim so as to hamper efforts to settle no penalties or attorney's fees may be recovered. Gambrell v. Audubon Insurance Company, 115 So.2d 727 (La.App.Orl.1959). In the case of Menard v. Andrew Jackson Apartments, Inc., 225 So.2d 249 (La.App. 4th Cir. 1969), it was held that where there was a serious dispute on the extent of the insured's damages which could only be resolved by litigation, that no penalties and attorney's fees could be recovered against the insurer.
We begin by noting that in the instant case the dispute arises not from misinterpretation of the policy by Houston General, but from a factual dispute. Therefore, Carney is inapplicable to this case.
The question here is was the defendant's failure to pay due to plaintiffs' inflating their claim and to a serious and justified dispute as to the extent of the damages, or was defendant acting in an arbitrary and capricious manner in its failure to pay the full amount which the trial court found to be owed.
Appellants contend that Houston General was arbitrary and capricious in continuing to rely on the Lochridge bid after Whitaker bid the work at a much larger amount and Florsheim informed it that it would not contract to restore the complex for Lochridge's price.
The trial judge awarded $560,460.70 for damages to the complex. Thus, Lochridge's bid was approximately $55,000 low and Whitaker's about $146,000 high. The error in the Whitaker bid was almost three times the error in the Lochridge bid.
We do not find that defendant was arbitrary or capricious in relying on by far the more accurate of the two bids. We also note that the Florsheim bid of $775,000 was even more inaccurate than the Whitaker bid. Thus, we cannot say that Houston General was arbitrary or capricious in its failure to be alarmed by Florsheim's refusal to accept a contract to repair the complex for the amount of the Lochridge bid and by Florsheim's subsequent bid which exceeded the amount of the Whitaker bid.
The record further shows that the Lochridge bid was judged reasonable by a qualified engineer who reviewed it. Florsheim agreed with the pricing in the Lochridge bid, but later differed on whether the work it proposed was enough to completely restore the project.
It is also relevant that the plaintiffs' claims were consistently excessive. The proof of loss included a $15,000 supervision fee for Equity's employee, McClure, who was resident manager of the complex and a $75,000 fee for Equity. This type of unnecessary expense would not be covered under the policy and appellants make no contention in brief that it was covered by the policy. The proof of loss also included highly excessive amounts for paving, fencing and landscaping.
The record shows that there was a genuine factual dispute between the parties as to the amount of work necessary to restore the complex and the cost of the work. The defendant's position in the dispute was reasonable and supported by substantial grounds. The trial judge did not err in failing to find defendant's actions arbitrary and capricious.
PLAINTIFFS' ASSIGNMENT # 7
Appellants contend that the $1,000 deductible reflected upon the declaration sheet of the policy was incorrectly allowed as a credit because they purchased for a separate premium "Special Extended Coverage" which provides for a maximum deductible of $500 for the eleven buildings damaged or destroyed. In the Special Extended Coverage Endorsement we find the following provisions relating to the deductible:
"Deductibles
The sum of $100.00 shall be deducted from the amount of loss to all property covered hereunder in any one occurrence resulting from all perils insured against. This deductible shall apply separately to each building or structure."
*1323 There are no other deductible provisions contained in the Special Extended Coverage Endorsement.
The appellants quoted from the deductible clause contained in the EXTENDED COVERAGE ENDORSEMENT which provides for a maximum of $50.00 deductible for each building. The SPECIAL EXTENDED ENDORSEMENT provides that the EXTENDED coverage endorsement is superseded by this endorsement. This provision of the Special Extended Coverage Endorsement has the effect of eliminating the deductible clause relied upon by appellants.
This assignment of error is without merit.
We now turn to the defendant's two final contentions in its answer to the appeal. In its fourth ground, the defendant urges that the trial court erred in awarding plaintiffs additional amounts when the property had been fully restored with the funds already tendered. Through its fifth contention, defendant urges that the trial court erred by awarding excessive damages. These arguments have essentially the same basis and we will therefore consider them together.
The record shows that the trial judge was correct in finding that the amounts paid by defendant were insufficient to fully restore the property. The payment was based partly on the Lochridge bid, which did not include an adequate amount for the repair of the pavement, and for the repair and replacement of the damaged and destroyed buildings, and the payment did not include a sufficient amount for loss of rent, which the evidence clearly establishes exceeds the loss of rent coverage of $129,600.
The totality of the evidence does not support defendant's contentions that appellants failed to diligently repair and replace the damaged and destroyed rental units so as to minimize the rent loss.
There is substantial evidence in the record to support all amounts awarded by the trial judge and we find no manifest error in his determination of the cost required to replace the damaged and destroyed property. The appellants were entitled to the additional amount awarded them by the trial judge above the amount previously paid by defendant.
These assignments are without merit.
The judgment appealed is AMENDED to commence the running of interest on May 22, 1979 on $30,760.25 of the judgment, and to commence running of interest on the remaining amount of the judgment, which is $29,183.05, on January 1, 1980. Otherwise, the judgment is AFFIRMED. All costs of this appeal are assessed equally between appellants and appellee.
NOTES
[1] Replacement cost coverage is designed to protect not only actual value of the insured property, but the depreciation on that property as well, thus maintaining the insured in the position to replace the insured property even though the cost of doing so exceeds the actual value of the insured property at the time of the loss. Columbia College v. Pennsylvania Insurance Co., 157 S.E.2d 416 (S.C.1967); Ruter v. Northwestern Fire and Marine Ins. Co., 72 N.J. Super. 467, 178 A.2d 640 (1962), pet. den. 37 N.J. 229, 181 A.2d 12 (N.J.1962).

Replacement cost coverage is of diminished utility in Louisiana because of the valued policy law and the jurisprudential construction of coverage on an actual cash value basis to mean the cost of repair or replacement of a partially destroyed object or of a totally destroyed object covered by a blanket-type policy without any allowance for depreciation. LSA-R.S. 22:695; Gibsland Supply Co. v. American Employers Ins. Co., 242 So.2d 310 (La.App. 2d Cir. 1970); Holloway v. Liberty Mutual Fire Insurance Co., 290 So.2d 791 (La.App. 1st Cir. 1974).
[2] C.C. 1901Agreements legally entered into have the effect of laws on those who have formed them.

They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.
They must be performed with good faith.
[3] Art. 1938"All debts shall bear interest at the rate of twelve percent per annum from the time they become due, unless otherwise stipulated."